Cite as 2022 Ark. App. 18

# ARKANSAS COURT OF APPEALS
DIVISION IV
No. CV-21-106

| | | |
|---|---|---|
| DIANA WILCOX | | |
| | APPELLANT | **Opinion Delivered** January 19, 2022 |
| | | |
| | | APPEAL FROM THE FAULKNER COUNTY CIRCUIT COURT [NO. 23DR-15-547] |
| V. | | |
| | | |
| RUBE "DUBBY" WILCOX | | |
| | APPELLEE | HONORABLE H.G. FOSTER, JUDGE |
| | | |
| | | AFFIRMED |

### RAYMOND R. ABRAMSON, Judge

This is an appeal from a decree of divorce the Faulkner County Circuit Court entered on July 13, 2018, granting Diana Wilcox an absolute divorce from Rube "Dubby" Wilcox. Diana appeals the decree and raises two arguments for reversal. This appeal was previously submitted to this court but was dismissed as premature for lack of a final order on October 28, 2020. The decree is now ripe for review, and we affirm the order of the circuit court.

I. *Background Facts*

Because both issues on appeal stem from what effect, if any, the parties' previous marriage and divorce have on the property division in the second divorce, we will provide some background information.

The parties were first married on May 20, 1978, and lived together as husband and wife until May 1, 2002. On November 14, 2002, the Faulkner County Circuit Court

granted Diana an absolute divorce from Dubby. The decree awarded temporary custody of the minor children to Diana, set child support, established a visitation schedule, allocated debts, detailed how Dubby could retrieve his personal effects, and distributed some marital property, including twenty-seven head of cattle and the marital residence. Not all property of the parties, however, was disposed of in the 2002 decree. Rather, the circuit court reserved all remaining issues, including a retirement account and a Little Debbie distributorship, for trial on January 24, 2003.

The January 24 hearing never occurred because the parties reconciled and remarried nearly two years later on May 20, 2004. As a result, Dubby never paid child support, the residence was not sold, and the property not specifically disposed of in the decree was never addressed. Ownership of the property not disposed of in the first divorce is a significant issue on appeal and will be discussed in further detail below.

II. *Current Proceedings*

On May 27, 2015, Diana filed a complaint for divorce in the Faulkner County Circuit Court. Dubby filed a response to the complaint denying any fault and asserted a counterclaim requesting an absolute divorce based on the statutory grounds of general indignities.

The final divorce hearing was held on October 23, 2017. Afterward, the court asked both parties to submit posttrial briefs on the issue of how property division in the current divorce would be affected by the parties' previous marriage. Diana urged the circuit court to "focus more on its duty and ability to divide the property on the equities of the situation regardless of any specific marital or non–marital nature of the property." By contrast, Dubby

2

argued various reasons why the retirement accounts, held solely in his name prior to the 2004 marriage, should not be considered marital property.

The circuit court entered an opinion letter outlining its ruling, and on July 13, 2018, the court incorporated the provisions thereof into the divorce decree. The court found the decree from the first divorce unenforceable in the present case and outlined in great detail its reasoning for this finding. In summary, the court concluded that "[t]he acts and omissions of the Parties subsequent to the final order entered in the 2002 case render any provisions thereof not fully complied with prior to, at least, their subsequent remarriage and commingling, unenforceable and moot." Furthermore, the circuit court ruled that the Little Debbie distributorship was a marital asset and awarded Dubby one-half of the value of the business. The court also found that the 1-8 retirement account was not marital property and therefore not subject to division. Diana timely appealed from the divorce decree on July 24, 2018.

On appeal, Diana contends the following: (1) the circuit court erred by finding that the parties' 2002 divorce decree converted by operation of law a retirement account—held in the sole name of Dubby but earned during the first marriage—to his sole property so as to render it nonmarital property in the second marriage; and (2) the circuit court erred in finding that a goodwill value attached to the valuation of the Little Debbie distributorship when the distributorship agreement specifically provided that it could be terminated for no cause with a thirty-day notice and that the trade designations and goodwill inured solely to the benefit of McKee Foods Corporation, the supplier.

III. *Standard of Review*

Domestic-relations cases are tried de novo on appeal, and the appellate court does not reverse a circuit court's finding unless they are clearly erroneous. *Taylor v. Taylor*, 345 Ark. 300, 47 S.W.3d 222 (2001). A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Norman v. Norman*, 342 Ark. 493, 30 S.W.3d 83 (2000).

Furthermore, a circuit court has broad powers to distribute property in order to achieve an equitable distribution. *Keathley v. Keathley*, 76 Ark. App. 150, 61 S.W.3d 219 (2001). The overriding purpose of the property-division statute is to enable the court to make a division of property that is fair and equitable under the circumstances. *Id.* With respect to the division of property in a divorce case, we review the circuit court's findings of fact and affirm them unless they are clearly erroneous or against the preponderance of the evidence. *Thomas v. Thomas*, 68 Ark. App. 196, 4 S.W.3d 517 (1999). In reviewing a circuit court's findings, we defer to the court's superior position to determine the credibility of witnesses and the weight to be accorded to their testimony. *Keathley*, *supra*. This court acknowledges that the statute does not compel mathematical precision in the distribution of property; it simply requires that marital property be distributed equitably.

IV. *Discussion*

A. 1-8 Retirement Account

Diana alleges that the parties' intention to abandon their 2002 divorce was established by the fact that neither party pursued the terms of the settlement; neither pursued a hearing

on the remaining issues to ensure their remaining property rights; and neither pursued a hearing to enforce rights such as support. Diana further argues that the circuit court should have equally divided all of the parties' assets and debts on an equitable basis regardless of its specific designation as marital or nonmarital. Dubby counters that all marital property was required to be divided at the time of the 2002 decree unless the parties specifically agreed to postpone the division (which he alleges they did not), and because that did not occur, any property not distributed in the decree of divorce became the separate property of the spouse in whose name it was held.

For the purposes of determining the commencement of the marital estate, the circuit court found the date of the parties' current marriage (May 20, 2004) was controlling. While the circuit court clearly acknowledged the quandary presented by the parties' previous marriage and divorce decree reserving property issues for a trial that never occurred, after considering the parties' posttrial briefs, it ultimately decided that, by law, it was unable to enforce any provisions of an order sixteen years later. The court did not agree that it was "duty bound," as Diana argued, to consider all issues not addressed by the 2002 decree but instead ordered that it was unable to do so. The circuit court held:

2. To begin the analysis, provisions of the final order in #23DR–2002–410 cannot be enforced in Case # 23DR–15–547; absent some form of joinder, transfer, or other administrative action, any such attempt must fail, simply because they are two different cases. No action was ever taken to adopt or transfer the final order in 23DR–2002–410 to the instant case.

3. A second reason the 2002 case Order cannot be enforced, is the Parties failed to follow its provisions, either with regard to the specific rulings made therein, or with regard to the action agreed and ordered to be taken to "finish" the case. Any attempt to enforce this Order from the 2002 case must fail because the parties failed to follow said Order at the time it was entered.

5

4. A third reason enforcement of the Order from the 2002 case must fail in the instant case is the passage of time. From the plain language of the Order, not only were specific duties imposed on the Parties, which were never performed, but it clearly intended a speedy resolution of the issues sought therein to be preserved, and to argue that the intent of the Order was to preserve such issues for some 14-16 years strains credulity to the breaking point; obviously the attempted enforcement is made many years after expiration of the 90 days allowed for amendment; also, clearly there was no error made or alleged that would extend the 90 days.

5. The fourth reason enforcement of the final order entered in the 2002 case must fail, is the affirmative action taken by the Parties in contravention thereof. Without setting forth every act they took in direct contravention of the order sought by Ms. Wilcox to be enforced, they simply remarried, lived as husband and wife, and commingled their property and business, with very few, narrow exceptions.

6. The acts and omissions of the Parties subsequent to the final order entered in the 2002 case render any provisions thereof not fully complied with prior to, at least, their subsequent remarriage and commingling, unenforceable and moot.

Additionally, the parties argue at length over whether the 2002 decree was a final order. Diana argues that the parties agreed to reserve the property issues until after the divorce decree was entered, thus anticipating that the marital property would remain intact until a future date. While we acknowledge Diana's argument that the circuit court did not dispose of all the property in the 2002 decree, we find the finality of the 2002 decree irrelevant to our analysis, mainly because the 2002 divorce decree is not on appeal. Moreover, the circuit court clearly did not intend to reserve such division indefinitely. To the contrary, the circuit court set those issues for resolution two months later. As stated by the circuit court, "[T]o argue that the intent of the Order was to preserve such matters for 14–16 years strains credulity to the breaking point." We agree.

6

The fact that the parties reconciled after the divorce decree was entered and remarried two years later does not diminish the fact that Diana was granted an absolute divorce from Dubby on November 14, 2002. During the two years they were divorced, neither party attempted to have their legal rights to the undivided property established, nor did they take any steps whatsoever to comply with the 2002 order. Furthermore, no steps were ever taken to adopt or transfer the divorce decree in the 2002 case to the instant case. Taking all these factors into consideration, we find no clear error in the circuit court's decision to hold the parties' second marriage date as controlling for purposes of determining the commencement of the marital estate.

Regarding the 1-8 retirement account, the circuit court noted that the parties "remarried, lived as husband and wife, and commingled their property and business, with very few, narrow exceptions," one of those exceptions being the 1-8 account. It is undisputed that the 1-8 retirement account is and always has been held in Dubby's name only. As argued in Dubby's brief, nothing in the record indicates Dubby intended to bring the 1-8 account back into the marital estate. He kept it separate and did not contribute into the account after the remarriage, unlike with other retirement accounts that were held jointly with Diana. While Diana is correct in her assertion that the property-division statute gives the circuit court the discretion to divide property on the equities of the situation, we find that the circuit court distributed the property fairly and equitably in accordance with Ark. Code Ann. § 9-12-315 (Repl. 2020). While we certainly recognize the difficulty this particular set of facts places on the property division, we cannot say that the circuit court's ruling was clearly erroneous. We therefore affirm the circuit court's holding that the 1-8

7

retirement account was Dubby's separate property and, consequently, not subject to division.

## B. Little Debbie Distributorship

The issue on appeal is the business valuation the circuit court attributed to Diana's Little Debbie distributorship. Diana has been a distributor of Little Debbie products since 1996 under a distributorship agreement (the "Agreement") with McKee Foods Corporation. Therefore, it is undisputed that Diana was operating her business prior to the second marriage. In 2014, however, Diana filed to incorporate the business, thereby creating Diana Wilcox Distributing, Inc., and operated the business as a corporation for the three years preceding the divorce. For this reason, the circuit court found the distributorship to be a marital asset and subject to division. Diana contends that all property in her "possession" when the 2002 decree was entered, including her business, should be considered nonmarital in order to treat all the property consistently.

Second, Diana argues the circuit court erred by finding that a goodwill value attached to her business when the Agreement specifically stated the relationship could be terminated for no cause with thirty days' notice and provided that any goodwill inured solely to the benefit of McKee Foods. To support this argument at trial, Diana referred to the assignment clause in the Agreement, which she contended precluded her from selling her distributorship rights; thus, she concludes that the only "value" that could be attributed to her business is the value of its physical assets. Paragraph 22 of the Agreement states: "Neither this Agreement nor any rights or interests hereunder may be sold, transferred or assigned by

8

Distributor without the prior written consent of McKee. Any purported sale, transfer or assignment thereof by Distributor without such consent shall be null and void."

The circuit court ruled as follows regarding the distributorship:

7. As to the Little Debbie distributorship, the argument of Ms. Wilcox that the only value her business has is whatever the value of its physical assets, due to the non-assignment clause in her franchise agreement, is not persuasive.

8. The Little Debbie distributorship is a marital asset. Prior to its incorporation, it was operated as a sole proprietorship by Ms. Wilcox, and while the extent and motivation may be argued, it is found that Mr. Wilcox participated in the operation of the business to some extent, and certainly reaped benefits from its profits. When it was incorporated, it was as a closely held corporation, which is a form for family business, as well as others, but is consistent with the previous manner in which the parties handled the distributorship, and does not affect the marital nature of the asset.

9. There is a non-assignment clause in her franchise agreement that provides for sale of the franchise, it reserves the right to approve a potential franchisee, or not, to the franchiser. To accept Ms. Wilcox's argument, one must accept that there is a clause that sets the terms of assignment, but that there can never be an assignment, or sale, and that therefore the assignment clause is a nullity and language included in the agreement without effect or purpose. Had the interpretation urged by Plaintiff been correct, there would have been no assignment clause and just a blanket proscription on any assignment, ever. The letter wherein an employee of the franchiser says that the company would not approve a transfer are understood by the Court to mean that if a transfer had already occurred, apparently for the hypothetical posed, without the franchiser's prior approval, then in that even the attempted transfer would not be approved. This is not the interpretation urged by Ms. Wilcox. Therefore, the Court finds that the assignment clause does not devalue the business of all its goodwill and intangible assets, thereby effectively rendering it valueless, but for the office equipment, or any other physical assets.

10. Regarding the value of the distributorship, the Court finds that application of the method suggested by Steve Schroeder is appropriate, however, the Court will apply it to the $35,000 net profit to "operator or owner", as opposed to the $75,000 figure he considered which included a $40,000 per year salary for the operator, Ms. Wilcox, as the Court feels that a salary for whomever operates the business is an expense to the business and should not be calculated as profit, even though in this instance the salary goes to Ms.

9

Wilcox, making it marital income but not profit for purposes of valuing the business, therefore the Court values the distributorship at 3 times the net profit, giving a value of $105,000 for this marital asset. One half the value of the Little Debbie distributorship is awarded to Mr. Wilcox.

On appeal, Diana makes the following arguments to support her contention that the circuit court erred by relying on Dubby's expert in its business valuation: (1) the court mistakenly focused on whether the distributorship could be transferred rather than who held the authority to transfer the goodwill; (2) the circuit court ignored her expert's conclusion that he could not place a value on goodwill held by the distributor when the contract itself allowed for termination with a thirty-day notice without any cause; (3) Dubby's expert incorrectly compared the distributorship to a franchise to the point that the circuit court referred to it as a franchise; and (4) Dubby's expert did not have enough information to value the business.

Dubby refutes Diana's overall argument, stating that the inability to sell a business for more than the value of its physical assets does not determine its value in a divorce. More specifically, he argues that "[a]ll of the evidence, including the business's income stream, profit to the owner, and its assets, must be considered." In support of his contention, appellee cites *Atherton v. Atherton*, 2018 Ark. App. 245, 547 S.W.3d 759, wherein this court refused to find error with the circuit court's $175,000 valuation even though tax returns indicated the business in question operated at a loss two of the three previous years and had a negative net worth. This court reiterated the deference given to the circuit court's superior position to weigh the evidence and affirmed, in part, on the basis of testimony that there were cash assets taken in by the business that were not necessarily reflected in the financial documents. *Id*. at 7, 547 S.W.3d at 762.

10

At trial, two expert witnesses testified as to their respective valuations of the Little Debbie distributorship. Diana's expert witness was John Harwood, a certified public accountant ("CPA") with approximately twenty years' experience. Mr. Harwood based his valuation firmly on his contention that the Agreement "specifically says that the good will and all the things associated with it, like the Little Debbie name, all that, stays with McKee Foods and it says she does not have the right to transfer that." The crux of Mr. Harwood's testimony can be summed up in this testimony:

> When I'm doing my normalizing of my balance sheet and I'm trying to come together for valuation purposes, I'm going to be listing all the assets that we have ownership right to. The basic definition of an asset, for accounting purposes, it is an item that is a probable future economic benefit, meaning that there is a 51% greater chance that this item is going to be converted to cash or near cash equivalent in the future. I've got items here I'm being told can be transferred away from me with thirty-day notice and I have no residual value to. Those don't meet that definition of an asset for my financial statement.

To rebut Mr. Harwood's testimony, Dubby presented his expert witness, Steven Schroeder, an accredited senior business appraiser. Mr. Schroeder testified that the distributorship has a fair market value in the range of $150,000 to $225,000. He based this calculation on 2013 federal tax returns indicating the business had $541,271 in sales and $444,547 in gross profit as well as Diana's admission during discovery that her income after expenses was $75,000. Diana did not file any subsequent tax returns for the business. However, Mr. Schroeder testified that he was able to come to the conclusion that the business generated similar profits in 2014 and 2015 by referencing a letter from Chuck Thompson of McKee Foods dated April 22, 2016. Schroeder testified that from his review of the limited financial information available, Diana Wilcox Distributing, Inc., is a profitable business. Specifically, Schroeder explained: "You could think of it in a way as the income

11

from the goodwill of the business or the blue sky of the business and, in fact, it's commonly referred to that way. But, in business valuation, we think of it as an indicator of value." Regarding the effect, if any, the assignability clause has on the business valuation, he stated:

> A non-assignability clause such as this one would not pre-empt a valuator from looking to a model other than an asset model. In fact, we would look at the income stream as a more proper indicator of value. It's the income stream that makes a business worth having.

Accordingly, the circuit court was presented with one expert who assigned no value to the distributorship and another expert who does not believe the assignment clause prevents a valuation determination. Both experts agreed, however, that the typical way to value a small business such as this one would be two to three times the amount of discretionary earnings after expenses.

The circuit court did not find Diana's argument that the assignment clause served as a blanket proscription of any assignment persuasive. Instead, the court interpreted the language of the Agreement to mean that if a transfer had already occurred without the company's prior approval, it would not be approved. Furthermore, the circuit court did not accept Mr. Harwood's testimony that the clause rendered the business valueless.

However, the circuit court accepted the method of valuation set forth by Dubby's expert with the caveat that it found only $35,000 to be the business's net profit as opposed to the $75,000 figure Mr. Schroeder indicated, which included a $40,000 per-year salary for Diana as the operator of the business. The court reasoned that "a salary for whomever operates the business is an expense to the business and should not be calculated as profit." In conclusion, by applying the "income approach," the circuit court held that the value of the distributorship was three times the net profit for a value of $105,000.

12

Diana contends that Mr. Schroeder did not have enough information to place a value on the business. While it is certainly true that financial documentation was minimal, that was largely due to Diana's failure to provide information as well as her failure to file tax returns in the three years preceding the parties' divorce. Mr. Schroeder testified that his opinion was based solely on the distributorship's 2013 tax returns and a letter from a representative of McKee stating that the business generated similar profits in 2014 and 2015. Diana did not offer any testimony or evidence to dispel Mr. Schroeder's expert opinion that the distributorship is a profitable business; rather, she contends only that the business held no actual value according to the terms of the Agreement. As a result, the circuit court afforded greater weight to the testimony of Mr. Schroeder. We acknowledge that the lower court is in a better position to make such determination, and longstanding caselaw makes clear that it is not the place of our court to substitute our findings for that of the circuit court. Accordingly, given the broad powers of a circuit court to distribute property in an equitable manner, as well as our court's deference to the circuit court's superior position in weighing the testimony presented, we find no clear error in the circuit court's valuation. The circuit court's valuation of the Little Debbie distributorship is affirmed.

V. *Conclusion*

Considering the evidence and being mindful of our standard of review, we find no clear error in the circuit court's ruling.

Affirmed.

BARRETT and BROWN, JJ., agree.

*Helen Rice Grinder*, for appellant.

13

*The Bargar Law Firm, P.A.*, by: *James L. Bargar*; and *Brian G. Brooks, Attorney at Law, PLLC*, by: *Brian G. Brooks*, for appellee.