

# ARKANSAS COURT OF APPEALS

DIVISION III
**No.** CV–14–730

| | |
|---|---|
| JONI R. COLLINS<br>APPELLANT | **Opinion Delivered** SEPTEMBER 30, 2015 |
| V. | APPEAL FROM THE FAULKNER COUNTY CIRCUIT COURT<br>[NO. 23DR-10-429] |
| MITCHELL L. COLLINS<br>APPELLEE | HONORABLE DAVID M. CLARK, JUDGE |
| | AFFIRMED ON DIRECT APPEAL;<br>AFFIRMED ON CROSS-APPEAL |

## DAVID M. GLOVER, Judge

Joni and Mitchell Collins were divorced by decree entered on October 28, 2011. As part of the divorce, they executed a property-settlement agreement that was incorporated into the decree. Critical to this appeal, the agreement provided that Mitchell's obligation to pay Joni alimony would terminate immediately upon Joni's remarriage or cohabitation. Late in 2012, Mitchell became suspicious that Joni was living with another man. On December 10, 2013, Mitchell filed a motion to terminate alimony, retroactively, alleging that Joni was cohabiting with another individual. Following a hearing on the motion, the trial court terminated Joni's alimony, effective April 7, 2014, which was the date of the hearing. Joni appeals, contending that the trial court erred in finding she had cohabited, and Mitchell cross-appeals, contending the trial court erred in refusing to make the termination of alimony retroactive to the date the cohabitation began. We affirm on direct appeal and on cross-

SLIP OPINION

appeal.

Our facts are not in dispute. The property-settlement agreement between the parties provided in pertinent part:

> All alimony payments will terminate immediately upon the death of either party or upon Joni's remarriage or cohabitation. Alimony payments will be contractual and not subject to modification.

At the April 7, 2014 hearing on the motion, Steve Turnage, a private investigator, testified Mitchell first contacted him in December 2012; and that he conducted surveillance for four nights in January 2013, but did not observe any signs of cohabitation. He reported that Mark Rogers was at Joni's house, but he did not see Rogers spend the night. According to Turnage, he resumed surveillance in October 2013, when Mitchell reported to him that he had observed Rogers's vehicle at Joni's house overnight or early morning and wanted some additional surveillance conducted. Turnage testified that he conducted surveillance during the time frame October 17 through October 30, 2013; that he took photos and videos; and that the actual surveillance dates were October 17, 18, 19, 24, 25, 29, and 30. He said that during this time period, Rogers's car was there "overnight always."

The private investigator explained that he then conducted thirty days' surveillance under the instructions of Mitchell's counsel, checking around midnight and 6 a.m. to see if Rogers's vehicle was present at Joni's residence. He was also instructed to periodically make longer observations. He started those checks on November 4, and the last check he did was on December 13. Turnage said the thirty days of checks occurred in more than a thirty-day period; there was a period of time when Joni was in Arizona; he suspended the activity checks

SLIP OPINION

for a period of time after Mr. Rogers left to go to Arizona; and he resumed the checks when they returned from Arizona. He explained that between October 17 and December 13, he conducted a total of thirty-seven checks regarding what was going on at Joni's residence. Briefly, Turnage reported that of the thirty-seven times he checked, there were only three times he did not observe Rogers's car staying overnight at Joni's house; that the last two of those three times was after she was served with the motion on December 11, 2013; and that the third time was when Rogers left to join Joni in Arizona. Turnage's testimony contains significant details for each period he conducted surveillance, all of which can be fairly summarized as reporting that Rogers would leave his place of work at the end of the day, bypass his own apartment for the most part, arrive at Joni's residence, remain there for the night, and leave in his work clothes the next morning. Turnage summarized his observations by stating, "From what I observed during all this surveillance and investigation, Mark Rogers gave all appearances of living with Ms. Collins."

Joni Collins acknowledged in her testimony that she and Mark Rogers were engaged in an exclusive sexual relationship; that when he spends the night at her house, they sleep in the same bed; that he has had a key to come and go from her house since at least October 2013; that Rogers spent a lot of nights at her house in the six weeks leading up to her being served with the motion to terminate alimony; that until she received the surveillance report, she was not sure; that she did not disagree with the surveillance report; that when Rogers ate at her house, they both did the cooking, both paid for the groceries, both did the dishes, and Rogers would occasionally take out the trash; that part of the reason he was there was to dog-

3

sit; and that he was probably at her house "a little bit more than normal," during that period because he was about to move and his apartment was "boxed up." Joni acknowledged, however, that in her earlier deposition in response to the question if there was any reason Rogers was staying at her house in 2013 besides the fact they were girlfriend and boyfriend, she had responded, "Not that I know of." Joni acknowledged that Rogers did not help with the utilities or the mortgage; that she paid for trips, including ones to Arizona and Hawaii; and that they stayed in the same hotel rooms during those trips.

Joni testified that, to her, "cohabitation" means living together, but stated that "if two people have two separate homes, and their names are on those homes or the leases, and they don't have any joint furniture, any shared expenses, I do not consider that living together." She stated she and Mark have discussed marriage "in a roundabout way," but not anytime soon. She explained he gave up his apartment and got a new place on Valletta Circle in Little Rock; she got a new place and is under contract to build a residence approximately 100 yards away from his; they are dating but she does not live with him; the nights in November were more excessive than normal; in the time they've been dating, they generally spend two to three nights a week together, sometimes more, sometimes less; and they were not going to spend every night together.

Joni explained she was fifty-two years old and had been married to Mitchell for twenty-six years when they divorced in October 2011. She reiterated that she considered living together as when both persons' names are on a lease, utilities are shared, furniture is owned together, and one residence is shared. She testified she did not have any joint

checking or saving accounts with Rogers; they had no joint investments or businesses; no joint debts; no joint credit cards or loans; no joint phone plans, utilities, cable, trash, gas, electricity, or water; no jointly owned vehicles or real estate; Rogers was not a beneficiary of her will; and she had never loaned him money. She said they had been dating about a year and a half; that she entered a construction contract for a new residence on November 4; and that Rogers finished the construction of his house and moved into it the same month she entered the contract for her house.

Joni said she has two indoor dogs; her preference is to leave them at her house when she travels; Rogers kept them for her while she was in Arizona for the birth of her grandson until he joined her there for a few days; Rogers typically "keeps a few shirts, maybe some work-out clothes at [her] house"; "he doesn't really keep them there, but − they go back and forth out of his truck"; he keeps shaving items and his toothbrush in a duffle bag; and he does not keep an extensive amount of clothes at her house.

The private investigator rebutted Joni's testimony, stating "all of the times that I saw Mr. [Mark] Rogers coming and going from Joni Collins's residence during my surveillance, I didn't see any kind of bag or suitcase that appeared to be any type of clothing bag or garment bag. I didn't see a duffle bag." But then he acknowledged on cross-examination, "I wasn't usually hanging around on the activity checks to see actual people, just whether the vehicle was there. That's correct."

Mark Rogers testified that he is fifty-six years old; he has known Joni since late 2010; he did work for her as a CPA and CFB; she is currently his girlfriend; they have been dating

since September 30, 2012; he had been separated from his wife for about two years and was in a lengthy divorce; he committed to build his house in 2010; construction concluded on November 15, 2013; he closed late on November 4; movers moved his things in on November 15; he had to postpone moving two times before that because construction completion kept being delayed; he had expected to move in more like early to mid–October; during the month of November he spent more nights than normal at Joni's house because by mid-September he had his apartment completely packed up; that everything was in boxes; and he could not cook or do anything in his apartment.

Rogers acknowledged during the eighteen months he dated Joni, there had been multiple occasions he stayed overnight at her residence, averaging two to three times a week; the day he moved into his house, Joni asked him to care for her two dogs at her house while she went to Arizona for the birth of her grandson; he did not want the dogs at his house; he dog sat from November 15, when she left, until he left to join her in Arizona on November 26; he returned on November 30 and took the dogs out of boarding; he does not typically keep clothes at Joni's residence; and at times he would take an extra shirt and a tie or two so he could change what he was wearing. His testimony was in agreement with Joni's that they had not commingled assets or debts; that they had traveled together a few times; that he paid when there was a business component to the trip; that she paid for some other trips, like Hawaii; that they alternated who paid at restaurants and other similar expenses; that he brings clothes to and from Joni's house in a suitcase or duffle bag, most often on a hanger; and that he keeps underwear, socks, and toiletries in the duffle bag.

Rogers reiterated that from September 2013 to December 2013, he was at Joni's house a lot more than he normally would have been "mostly to do with the fact that my apartment was packed up and I was staying at Ms. Collins's residence overnight more than I normally would have…."; during that period, it was common for him to wake up, shower, get dressed, and go to work from Joni's house in the mornings; over the course of the relationship, he would average spending two or three nights per week at Joni's residence. He acknowledged they slept in the same bed during this period; they went places as a couple; and they went to family events. He explained he took his firearms to Joni's house because he was concerned about the ease of breaking into an apartment and at Joni's they would be behind a gate and security system.

Joni and Mitchell Collins's daughter, Ashley, testified that the parties are her parents; she is a student at UCA; she also works for her dad; she lives in Conway; she only went to visit her mother about once a month; during those visits, she never observed anything at the house that made her think somebody was living with her mother; there had been occasions when she spent the night at her mother's during 2013, and she never observed any indication that somebody was living there.

The supplemental abstract sets out the trial court's comments from the bench at the end of the hearing,

> It is clear that this is exactly what cohabitation is. That is exactly why clauses of that nature are included, so that a payee[sic] spouse is not supplementing the income of the ex-spouse and their significant other. That appears to be exactly what is going on, especially when we couple in paying for trips to Hawaii and Arizona. . . . They were living together in the same house.

SLIP OPINION

The trial court totally discredited Rogers's testimony that Rogers brought his clothes to Joni's house every day. In addition, the court commented he did not find the case to even be close; it was clearly cohabitation; it was clearly what was contemplated by the parties' agreement; and alimony would cease "as of today."

In this appeal, Joni contends that the trial court erred in finding she had cohabited with Rogers and terminating her alimony on that basis. We disagree.

The property-settlement agreement at issue here was incorporated, not merged, into the divorce decree. Our law is clear. A separate and independent property-settlement agreement that has been incorporated into a divorce decree leaves a trial court without authority to modify the agreement; rather, the issue of whether alimony should be terminated is based on an analysis of the contract language. *Rockefeller v. Rockefeller*, 335 Ark. 145, 980 S.W.2d 255 (1998). Questions relating to the construction, operation, and effect of independent property-settlement agreements are governed, in general, by the rules and provisions applicable to other contracts generally. *Surratt v. Surratt*, 85 Ark. App. 267, 148 S.W.3d 761 (2004). The initial determination of whether an ambiguity exists lies with the trial court. *Id.* When a contract is unambiguous, its construction is a question of law for the court. *Id.* A contract is unambiguous and its construction and legal effect are questions of law when its terms are not susceptible to more than one equally reasonable construction. *Id.* When contracting parties express their intention in a written instrument in clear and unambiguous language, it is the court's duty to construe the writing in accordance with the plain meaning of the language employed. *Id.*

Here, the property-settlement agreement between the parties provided, "All alimony payments will terminate immediately upon the death of either party or upon Joni's remarriage or cohabitation." The term at issue is "cohabitation." Joni takes the position that the term should be interpreted in light of how it affects her financially, instead of living arrangements or romantic relationship, and that she interpreted the term to encompass a situation where she and her boyfriend lived together and shared living expenses. We do not agree.

While we do not defer to the trial court on this issue of law, we do agree with it that the term "cohabitation" is not ambiguous, i.e., it is not susceptible to more than one equally reasonable construction. *The Oxford English Dictionary* defines "cohabitation" as, "1. Dwelling or living together; community of life; 2. Living together as husband and wife (often with the implication of not being married)." 449 (2d ed. 1989). *The American Heritage College Dictionary* defines the term "cohabit" as, "1. To live together as spouses. 2. To live together in a sexual relationship when not legally married." 271 (3d ed. 1993). None of these definitions focuses upon financial arrangements between the persons who are cohabiting; instead, the focus is living arrangements, with an emphasis upon the existence of a sexual relationship. Under these definitions, if a couple is living under the same roof and having sex, cohabitation is implicated. With this plain meaning of the term cohabitation in place, we find no clear error in the trial court's factual conclusion that the evidence presented at the hearing established that Joni and Rogers were cohabiting. We do not find convincing Joni's arguments regarding the financial context of the agreement or the ambiguity of the term.

For his cross-appeal, Mitchell contends that we should reverse the trial court's ruling

9

that the alimony-termination provision of the parties' property-settlement agreement was not self-executing and automatically effective on the date cohabitation began. Neither do we find a basis for reversal of the trial court's decision in this regard.

The property-settlement agreement provided that alimony payments were to terminate "immediately" upon cohabitation. The trial court found that the termination of alimony as a result of cohabitation was not self-executing and was not terminated until the court declared it to be. The trial court further concluded that Mitchell's alimony obligation was terminated effective April 7, 2014, which was the date of the hearing. We find no error in this resolution of the issue. What one moment in time can "cohabitation" be said to begin? As reasoned by the trial court, making that determination involves an assessment of the facts presented on the issue. Only after hearing and assessing the evidence presented at the hearing, was the trial court in a position to make that determination.

Affirmed on direct appeal; affirmed on cross-appeal.

VIRDEN and VAUGHT, JJ., agree.

*Worsham Law Firm, P.A.*, by: *Richard E. Worsham*, for appellant.

*Wagoner Law Firm, P.A.*, by: *Jack Wagoner III* and *Harrison Kemp*, for appellee.