Cite as 2022 Ark. App. 143

# ARKANSAS COURT OF APPEALS

DIVISION I
**No.** CV-21-46

| | |
|---|---|
| JASON D. ROWAN<br><br>APPELLANT | **Opinion Delivered** March 30, 2022<br><br>APPEAL FROM THE BENTON COUNTY CIRCUIT COURT [NO. 04DR-13-1756] |
| V.<br><br>MARY BETH HUNTER ROWAN<br>APPELLEE | HONORABLE JOHN R. SCOTT, JUDGE<br><br>AFFIRMED |

## LARRY D. VAUGHT, Judge

On October 16, 2020, the Benton County Circuit Court entered a final order denying a motion for contempt filed by appellee Mary Beth Hunter (formerly Rowan) against appellant Jason Rowan and ordering Jason to pay Mary Beth $77,234.35 plus interest following Jason's sale of the parties' former marital home. Jason filed a posttrial motion to vacate and amend the final order, and it was deemed denied. Jason appeals the final order and the deemed denial of his posttrial motion. He argues that the circuit court clearly erred in awarding Mary Beth one-half of the "proceeds" from the sale of the home when their property-settlement agreement ("PSA") provided that she would receive one-half of the "profit" from the sale of the home. Jason also argues that the court clearly erred in entering an award in Mary Beth's favor because the court found that he was not in contempt. We affirm.

Mary Beth and Jason were married in April 2013 and divorced in December 2013. The divorce decree states that the parties had

executed all necessary documents—attached hereinto as Exhibit "A"—for all real estate property, personal property and financial responsibilities. Said exhibit is a final disposition of the matters to insure the quiet enjoyment of said property by the other.

Attached to the decree as exhibit A is a ten-page PSA signed by the parties in October 2013. It is undisputed that Mary Beth prepared the PSA.

The PSA sets forth the parties' division of their home, personal property, retirement and bank accounts, and other items. Regarding the parties' home, the PSA states that Mary Beth owned the home for four years prior to the marriage but that "[t]he parties agree that it is in the best interest of [Jason's] daughter—from a previous marriage . . . to allow [Jason] the opportunity to own the family residence." The PSA goes on to provide the following: (1) Jason will remain in the home "so long as [he] qualifies and completes the refinancing process to secure a mortgage loan in the amount of $165,645.01 to payoff [the] mortgage loan . . . ."; (2) Mary Beth will waive her current equity of $12,355 in the home; (3) Mary Beth will contribute the escrow balance of $1,430.40 from the home toward Jason's closing costs; and (4) Mary Beth will quitclaim title to the home to Jason upon his refinancing it.

At issue in this case is the following provision in the PSA wherein Jason agreed that

[a]t any time—while [Mary Beth] is living—[Jason] sells [the] family residence, [Mary Beth] and [Jason] will divide[ ]—50/50—any profit that exceeds the current appraisal value—$178,000.00—minus any upgrades to [the] family residence.

As per the PSA, Jason refinanced the mortgage, and Mary Beth quitclaimed the home to Jason in December 2013. It is undisputed that Jason did not make any upgrades to the property.

On October 26, 2019, Mary Beth moved for contempt against Jason, alleging that he sold the home on June 4, 2019, but did not pay her one-half of the equity that exceeded

2

$178,000 as required in the PSA. She requested that the circuit court find Jason in contempt and order that he pay her one-half of the equity over $178,000.

In Jason's response, he alleged that Mary Beth received a "cash settlement of $45,244.32, which sum reflected one-half of the profit realized from the sale of said real estate, over and above the contract in the amount of $178,000.00." Jason attached to his response a copy of the title company's disbursement summary, which demonstrates that Jason sold the home for $425,000; from that amount, the mortgage debt ($153,439.12) and other costs were deducted; then Jason was credited with the $178,000 appraisal value; and the remaining $90,488.64 was equally distributed to Mary Beth and Jason, each receiving $45,244.32. Therefore, as a result of the sale of the home, Jason's mortgage was paid, he received $223,244.32 in cash ($178,000 + $45,244.32) and Mary Beth received $45,244.32 in cash.

A hearing was held on Mary Beth's motion on October 1, 2020, and she was the only witness to testify. She stated that at the time of the 2013 divorce, the mortgage on the home was in her name and the amount owed was $165,645.01. When asked how she came up with the "current appraisal value" of $178,000, she said that she arrived at that value by adding the mortgage and her equity in the home ($165,645.01 + $12,355 = $178,000.01). She testified that it was her intent that when the house was sold, Jason's mortgage would be paid off and then the parties would equally split the remaining funds. She said that she did not intend for the mortgage to be paid off and for Jason to receive $178,000 before the parties equally divided the proceeds. She testified that Jason was essentially paid two times for his mortgage before the parties divided the proceeds, which was not her intent.

3

In closing argument, Mary Beth's counsel contended that it is not a reasonable interpretation of the PSA to pay Jason's mortgage and give him $178,000 before dividing what is left equally between the parties. She argued that in no way can that be considered 50/50 division, which is what the PSA provided for and what was intended. Jason's counsel argued that Mary Beth was paid by the title company in accordance with the terms of the PSA that she drafted and that he was not in contempt.

At the conclusion of the hearing, the circuit court orally ruled that Jason was not in contempt. However, the court, stated that it was "strictly constru[ing]" the parties' PSA and found that it is undisputed that Mary Beth is alive, Jason sold the home for $425,000, and there had been no upgrades to the home. The court then subtracted the current appraisal value of $178,000 from the sales price, leaving $247,000, which the court found was to be equally divided between the parties—$123,500 each.

The court then found that it was fair and equitable for the parties to equally divide and pay all costs related to the sale of the home[1] that totaled $2,042.66. The court subtracted $1,021.33 from $123,500 and found that each party was to receive $122,478.67. Because Mary Beth had already received $45,244.32, the court ordered Jason to pay her $77,234.35 ($122,478.67 - $45,244.32) plus interest at the rate of 2 percent per annum beginning June 4, 2019, until paid. The circuit court's written final order outlining these findings was entered on October 16.

---

[1]These costs included the $350 closing fee to the title company; the $200 title-search and exam fee; the $573.50 title-insurance premium; the $701.25 state tax-stamp assessment; and the $217.91 pest inspection.

On October 29, Jason moved to vacate and amend the final order, arguing that the circuit court erred in its calculations because the court divided the "proceeds" of the sale of the home between the parties when the contract expressly provided for the division of the "profit" that exceeded the current appraisal value of $178,000. Jason contended that "profit" means excess revenue over expenditures, while "proceeds" is the money received from a sale—in other words—"proceeds" minus expenditures equals "profit." Jason argued that because the mortgage was an expenditure, the circuit court should have (1) taken the sale "proceeds" and subtracted the mortgage and all other necessary costs to sell the property, (2) deducted and credited him with the $178,000 current appraisal value, and then (3) divided the "profit" equally between the parties. Jason also contended that the circuit court erred in awarding monetary damages against him when the court had found that he was not in contempt. The circuit court did not rule on Jason's posttrial motion, and it was deemed denied on November 30, 2020. This appeal followed.

We review domestic-relations cases de novo, but we will not reverse a circuit court's finding of fact unless it is clearly erroneous. *Darcey v. Matthews*, 2017 Ark. App. 692, at 5, 537 S.W.3d 780, 785. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court is left with a definite and firm conviction that the circuit court has made a mistake. *Id.*, 537 S.W.3d at 785. In reviewing a circuit court's findings of fact, we give due deference to the court's superior position to determine the credibility of the witnesses and the weight to be accorded to their testimony. *Id.*, 537 S.W.3d at 785.

We are called to interpret the PSA signed by Mary Beth and Jason and referenced in, and attached to, the parties' divorce decree. A separate and independent property-settlement

5

agreement that has been incorporated into a divorce decree leaves a circuit court without authority to modify the agreement; rather, the issue of how to interpret the agreement is based on an analysis of the contract language. *Collins v. Collins*, 2015 Ark. App. 525, at 8, 471 S.W.3d 665, 669. Questions relating to the construction, operation, and effect of independent property-settlement agreements are governed, in general, by the rules and provisions applicable to other contracts generally. *Id.*, 471 S.W.3d at 669.

> The first rule of interpretation of a contract is to give to the language employed the meaning that the parties intended. In construing any contract, we must consider the sense and meaning of the words used by the parties as they are taken and understood in their plain and ordinary meaning. The best construction is that which is made by viewing the subject of the contract, as the mass of mankind would view it, as it may be safely assumed that such was the aspect in which the parties themselves viewed it. It is also a well-settled rule in construing a contract that the intention of the parties is to be gathered, not from particular words and phrases, but from the whole context of the agreement.

*Singletary v. Singletary*, 2013 Ark. 506, at 10, 431 S.W.3d 234, 240 (citing *Wal-Mart Stores, Inc. v. Coughlin*, 369 Ark. 365, 371, 255 S.W.3d 424, 429 (2007) (quoting *Alexander v. McEwen*, 367 Ark. 241, 244, 239 S.W.3d 519, 522 (2006))). Conclusions concerning the true intention of the parties primarily involve issues of fact, and the circuit court's decision will not be reversed unless the findings are clearly erroneous. *Jones v. Jones*, 26 Ark. App. 1, 4–5, 759 S.W.2d 42, 44 (1988).

Jason's first argument on appeal is that the PSA is not ambiguous in that it requires the parties to evenly divide the profit that exceeds the current appraisal value. He maintains that the circuit court erred in interpreting the PSA because the court "swapped" the word "profit," which is used in the PSA, for "proceeds," which is not. Jason contends that the court's change is significant because the term "proceeds" does not require that the mortgage expense be

deducted before distribution to the parties, while the term "profit" does require that the mortgage expense be deducted before distribution to the parties. Jason further contends that this change was improper because "[a] court has no authority to modify an independent contract that is made part of a divorce decree." *Parker v. Parker*, 2019 Ark. App. 607, at 8, 591 S.W.3d 818, 823.

We hold that the circuit court did not modify the PSA as argued by Jason. Rather, the court strictly construed the unambiguous PSA and concluded that the sales price was $425,000, the PSA requires that $178,000—which accounted for the mortgage expense—be deducted and credited to Jason, and that the remaining funds—the profit—be equally divided between the parties. This interpretation is supported by the language of the PSA, wherein it is explained how the parties arrived at the current appraisal value of $178,000: the PSA states that the mortgage on the home at the time of the divorce was $165,645.01 and that the equity in the home was $12,355, which, combined, is $178,000.01. The fact that the mortgage expense was included in the current appraisal value demonstrates the intent of the parties: if Jason sold the home, he would be entitled to $178,000 to pay off his mortgage and that the remaining profit would be split equally between the parties. While the court may have interchanged the terms "proceeds" and "profit" in its order, Jason's focus on this misses the point because the court did exactly what Jason asked it to do: deduct the mortgage—included in the $178,000—from the sales price before equally dividing the remaining funds. This is consistent with the plain and ordinary meaning of the term "profit" as stated in the PSA and consistent with the intent of the parties. What Jason is really requesting is that he should be paid twice for his mortgage; however, there is no language in the PSA to support this interpretation. Because we are not

left with a definite and firm conviction that the circuit court has made a mistake, we affirm the court's award to Mary Beth of $77,234.35 plus interest.

Jason's second argument on appeal is that circuit court erred in awarding Mary Beth $77,234.35 plus interest after finding that he was not in willful and malicious contempt of the court's decree. He claims that because the circuit court found that he did not "wrong" Mary Beth, it erred in awarding her damages. For support, he cites article 2, section 13 of the Arkansas Constitution, which provides: "Every person is entitled to a certain remedy in the laws for all injuries or wrongs he may receive in his person, property or character . . . ." Ark. Const. art. 2, § 13. We reject Jason's argument.

In Mary Beth's motion for contempt, she made two separate and distinct requests for relief: (1) that Jason be held in willful contempt for failing to pay her an equal amount of the profit resulting from the sale of his home, and (2) that Jason be ordered to pay her an equal amount of the profit as provided for under the terms of the PSA. Jason's argument improperly conflates Mary Beth's two separate requests for relief. Just because the circuit court found he was not willful or malicious in failing to pay Mary Beth does not mean he cannot be held separately liable for breach of the PSA. Other than his own reasoning and citation to the Arkansas Constitution, which has no application in this matter, Jason does not cite any legal authority in support of his argument as to why the court's award was unwarranted. This court may refuse to consider an argument when the appellant fails to cite any legal authority, and the failure to cite authority or make a convincing argument is sufficient reason for affirmance. *Jewell v. Fletcher*, 2010 Ark. 195, at 24, 377 S.W.3d 176, 191 (citing *Middleton v. Lockhart*, 344 Ark.

572, 43 S.W.3d 113 (2001)). Thus, we affirm the circuit court's order directing Jason to pay Mary Beth $77,234.35 plus interest.

Affirmed.

GRUBER and HIXSON, JJ., agree.

*Kezhaya Law PLC*, by: *Matthew A. Kezhaya*, for appellant.

*Rhoads & Armstrong, PLLC*, by: *Johnnie Emberton Rhoads*, for appellee.