Cite as 2026 Ark. App. 307

# ARKANSAS COURT OF APPEALS

DIVISION IV

No. CV-25-334

|  |  |
|---|---|
| SARA LAKEY SCOTT | **Opinion Delivered** May 13, 2026 |
| APPELLANT | APPEAL FROM THE BENTON COUNTY CIRCUIT COURT [NO. 04DR-22-1326] |
| V. |  |
| TIMOTHY RYAN SCOTT | HONORABLE THOMAS SMITH, JUDGE |
| APPELLEE | REVERSED |

**WAYMOND M. BROWN, Judge**

Appellant Sara Lakey Scott appeals from the February 15, 2025 order of the Benton County Circuit Court that terminated appellee Timothy Ryan Scott's ("Ryan's") obligation to pay her alimony. On appeal, Sara argues that the circuit court erred in (1) finding that she cohabited full time with her boyfriend and (2) determining the effective date of alimony termination. We find error and reverse the circuit court's order terminating alimony.

Sara and Ryan were divorced by decree in September 2023. The parties settled issues of child custody, child support, and real- and personal-property rights as set forth in their mediation agreement. A final divorce hearing was held regarding the sole issue of alimony. Following the hearing, a divorce decree was entered ordering Ryan to pay temporary alimony to Sara in the amount of $2500 a month for sixty months. Additionally, for the years 2023, 2024, and 2025, if Ryan's gross income exceeds $500,000, he shall pay Sara 10 percent of the amount exceeding $500,000 in

January of the preceding year as additional alimony. The decree provided that "the payment of alimony is subject to modification pursuant to Arkansas law."

On September 17, 2024, Ryan moved to terminate alimony. He alleged that pursuant to Arkansas law, his alimony obligation should cease because Sara was "cohabiting with her romantic partner."

At the January 16, 2025 hearing on the motion to terminate alimony, Ryan testified first. He stated that in April 2024, he saw the same vehicle, a black SUV, parked at Sara's home for multiple days in a row. He became suspicious that Sara was cohabiting with a boyfriend and hired a private investigator, Darrell Propps, to conduct surveillance on Sara's residence. Ryan testified that as a result of Propps's investigation, it became "clear to [him] that Sara [ ] was cohabiting with Will Bradley." Ryan stated that he then filed the motion to terminate alimony on the basis of Sara's cohabitation.

On cross-examination, Ryan testified that in April 2024, his "early morning drive-bys" revealed that "there was someone staying the night pretty much the whole week" when Sara did not have the parties' children. Ryan hired Propps in July to conduct surveillance on Sara's home during the weeks she did not have the children. The surveillance continued through mid-September. Ryan stated that, to his knowledge, Will had not met the children.

Private investigator Darrell Propps testified that Ryan hired him to monitor the comings and goings of people at Sara's address. Propps was similarly instructed to surveil Will's apartment complex and the address of his insurance business. Propps stated that Ryan asked him to "find out if there was cohabitation going on" at Sara's residence. Ryan specifically wanted to know if someone other than his ex-wife was living at the address.

2

Propps saw both a red SUV and a black SUV frequent Sara's residence. Using license plate information, Propps determined that the black SUV belonged to Will. He witnessed Will access the garage of Sara's home upon arrival, even during times that Sara's vehicle was not there. Propps noted times that Sara's vehicle left while Will's vehicle remained in the garage of the home. Propps also saw Will handle lawncare; he captured camera footage of Will mowing the lawn, weed eating, and using a leaf blower and a rake.

Propps testified that Will occasionally left the residence in the morning wearing different clothing than he had worn the prior evening. He noted that on some mornings, he also saw Will go directly to his place of work after leaving Sara's residence.

On cross-examination, Propps stated that Ryan instructed him to surveil Sara's house, Will's apartment, and Will's place of business on an every-other-week basis, when Sara did not have the parties' children in her care. Propps testified that he saw Will spend one overnight during a week of surveillance in July. During the first week of August, Will again spent one night at Sara's residence. Propps stated that during the third week of August, Will stayed overnight at Sara's house six nights. During the first week of September, Will stayed overnight at Sara's three nights. Then during the third week of the month, Will stayed overnight only once. Propps summed up the findings of his investigation, stating that he surveilled Sara's residence twenty-seven nights and saw Will there seven to nine times.

Will Bradley was next to testify at the hearing. He stated that he met Sara in April 2024. He began spending nights at her residence in mid-April; the frequency varied from month to month. He estimated that he stayed the night at her residence eleven to thirteen times some months and less other months. He stated that, from April through September, he spent multiple nights at Sara's on

3

the weeks she did not have her children. Will testified that he did not spend nights during the weeks Sara's children were in the home.

Will acknowledged that there were times he spent the night, changed clothes, and went directly to work the next day from Sara's residence. He used a phone app to access Sara's garage but denied that she granted him permission to come and go as he pleased. Will stated that he did not assist with cleaning the house, although he did aid in maintaining the yard. He testified that he stopped spending nights at Sara's house in September after she was served with the petition to terminate her alimony.

On cross-examination, Will stated that he had never met Sara's children and did not participate in family events. He stated that he did not keep clothes at Sara's house, but he usually had a change of clothes in his vehicle. Will said that he did not shower at Sara's home, nor did he keep toiletries at her house. He did not receive mail at Sara's address and did not help her financially with bills. When the motion to terminate alimony was filed, Will and Sara had been involved in a four-month relationship, they had not discussed marriage, and he did not live with Sara full time.

Sara testified that she has physical custody of the children on a "week-on/week-off basis." She and Will are dating but are not involved in a serious relationship, and he has never met her children. She provided Will access to her garage using an app so that he did not "have to sit in the driveway" until she arrived. Sara stated that, on average, Will spent "four or five to ten" nights a month at her house. Will did not bring clothes or an overnight bag to her house, but he always had a change of clothes in his car. They did not share bills or make joint purchases. Sara admitted that she and Will have a sexual relationship but denied that they cohabited.

At the conclusion of the hearing, the circuit court ruled that "cohabitation did take place" and ordered Ryan's alimony payments to Sara to cease as of October 1. The court ordered Sara to reimburse Ryan for the alimony payments made since October 1, less the 10 percent of his gross income exceeding $500,000 for 2024. This appeal followed.

Sara argues that the circuit court erred in finding that she cohabited with her boyfriend, Will, and subsequently terminating Ryan's alimony obligation to her. Ryan contends that the circuit court's cohabitation finding and termination of his alimony obligation is supported by the factual record and Arkansas law.

We review domestic-relations cases de novo, but we will not reverse a circuit court's finding of fact unless it is clearly erroneous.[1] A finding is clearly erroneous when, although there is evidence to support it, the reviewing court is left with a definite and firm conviction that the circuit court has made a mistake.[2] In reviewing a circuit court's findings of fact, we give due deference to the court's superior position to determine the credibility of the witnesses and the weight to be accorded to their testimony.[3]

While the above standard applies to findings of fact, appellate courts will not defer to the circuit court on a question of law.[4] The circuit court's decision will be reversed if it erroneously applied the law and the appellant suffered prejudice as a result.[5]

---

[1]*Hunter v. Haunert*, 101 Ark. App. 93, 270 S.W.3d 339 (2007).

[2]*Id.*

[3]*Klenakis v. Klenakis*, 2017 Ark. App. 36, 510 S.W.3d 821.
[4]*Jones v. Abraham*, 67 Ark. App. 304, 999 S.W.2d 698 (1999).

[5]*Id.*

In the order terminating Ryan's alimony obligation, the circuit court stated that it examined the relevant case law—*Collins v. Collins*[6] and *Klenakis v. Klenakis*[7]—and the controlling statutory law—Arkansas Code Annotated section 9-12-312(a)(2)(D)[8]—and determined that after applying the law to the facts at hand, there was sufficient evidence that Sara was cohabiting. The circuit court found that according to the definition of cohabitation outlined in *Collins*, the relevant inquiry is whether individuals are living together on a regular basis.

In *Collins*,[9] this court affirmed the circuit court's finding that the ex-wife was cohabiting with her boyfriend, even though he had a separate apartment and did not help financially with the ex-wife's utilities or mortgage. The couple shared no joint assets or debt. The circuit court found that the couple was cohabiting, holding that the focus is on living arrangements, with an emphasis on the existence of a sexual relationship: if a couple is living together under the same roof and having sex, cohabitation is implicated.

In *Klenakis*,[10] the ex-wife and her boyfriend were in a long-term romantic relationship, saw each other every day, made joint purchases, and spent the night together four nights a week, and the boyfriend kept toiletries, clothing, and documents at the ex-wife's house. The boyfriend additionally purchased appliances for the ex-wife's home and represented her address as his own. The circuit

---

[6]2015 Ark. App. 525, 471 S.W.3d 665.

[7]2017 Ark. App. 36, 510 S.W.3d 821.

[8](Repl. 2020).

[9]*Supra*.

[10]*Supra*.

court ruled that cohabitation did not take place and denied the ex-husband's petition to terminate alimony. On appeal, this court reversed and remanded, holding that sufficient evidence supported a finding that the ex-wife was cohabiting with her boyfriend; thus, the ex-husband was entitled to termination of his alimony obligation.

Here, Sara and Will had been in a four-month intimate sexual relationship when the motion to terminate alimony was filed, after which "sleepovers" at Sara's house ceased. Every other week, Will stayed a few overnights at Sara's house when she did not have custody of her children. He had access to her garage via an app on his cell phone. Will occasionally left Sara's residence and went directly to work on mornings following his overnight stays. He did not keep clothes, toiletries, or other personal belongings at Sara's house, but he did keep clothes in his vehicle. He admitted doing yardwork with Sara, but he maintained his own apartment; he did not financially assist Sara with bills; they made no joint purchases; they split expenses when they were together; and he had not met her children.

Ryan argues that similar to the facts in *Collins* and *Klenakis*, this case presents sufficient evidence of cohabitation, and the circuit court did not err in terminating his obligation to pay alimony to Sara. He urges that cohabitation has occurred under the definition outlined in *Collins* and *Klenakis*.

Sara argues on appeal that the circuit court "misapplied its analysis for cohabitation in terms of alimony." She contends that this case is distinguishable from *Collins* and *Klenakis*, and alimony was subject to termination only under the terms outlined in Arkansas Code Annotated section 9-12-312(a)(2)(D). We agree.

In *Collins* and *Klenakis*, relied on by the circuit court in making its cohabitation finding, alimony was terminable upon cohabitation under the terms of their contractual agreement. In *Collins*,

the parties executed a property-settlement agreement that was incorporated into the divorce decree. The agreement provided that the ex-husband's obligation to pay alimony would terminate immediately upon the ex-wife's remarriage or cohabitation. Likewise, in *Klenakis*, the parties' property-settlement agreement stated that the ex-husband's alimony obligation would terminate upon the ex-wife's death, remarriage, or cohabitation with a man to whom she was not married or related.

A court has no authority to modify an independent contract that is made part of a divorce decree.[11] Alimony, in instances where there is an agreement, arises from a contractual right, not an equitable right, through the system of justice.[12] While the agreement is still subject to judicial interpretation, we must apply the rules of contract construction in interpreting the agreement.[13] When a contract is unambiguous, its construction is a question of law for this court.[14] When contracting parties express their intention in a written instrument in clear and unambiguous language, it is the court's duty to construe the writing in accordance with the plain meaning of the language employed.[15]

Alimony obligations in *Collins* and *Klenakis* were terminable upon cohabitation under the terms of their contractual agreements. The term cohabitation has been defined in our case law as

---

[11]*Artman v. Hoy*, 370 Ark. 131, 257 S.W.3d 864 (2007).

[12]*Id.*

[13]*Id.*

[14]*Id.*

[15]*Id.*

living together under the same roof and having sex, with no focus on financial arrangements between the couple. However, here, Ryan's obligation to pay Sara alimony did not arise from a property-settlement agreement with its own terms defining the circumstances of its termination. Unlike in *Collins* and *Klenakis*, on which the circuit court relied, Ryan and Sara did not have a contract that provided for termination of alimony upon cohabitation.

Ryan was ordered to pay Sara alimony by the circuit court in its decree of divorce. The decree provided that "the payment of alimony is subject to modification pursuant to Arkansas law." Hence, the termination of alimony in this case is analyzed only under relevant Arkansas law and not simply under the defined term of cohabitation.

Arkansas Code Annotated section 9-12-312(a)(2)(D) provides that unless otherwise ordered by the court or agreed to by the parties, the liability for alimony shall automatically cease upon the living full time with another person in an intimate, cohabitating relationship. We have found no cases in which our appellate courts have had occasion to interpret the meaning of "living full time with another person in an intimate, cohabitating relationship." As discussed above, the leading cases on the matter of alimony termination had the benefit of termination simply upon a finding of cohabitation pursuant to the terms of the parties' agreement. However, under the plain language of the statute, "living full time with another person" implies more than the situation presented here in which Sara's boyfriend stayed overnight at her home a few days a week on a "week-on, week-off" basis and maintained his own residence to the same level he had before his relationship with Sara.

Furthermore, before 2013, the relevant statute provided that alimony ceased upon remarriage of the person awarded alimony, a relationship that produces a child and results in the recipient of the alimony receiving court-ordered support, or a relationship that produces a child and

9

results in a court order directing the recipient of the alimony to provide support. Act 1487 of 2013, § 1, effective August 16, 2013, added, among other things, that alimony shall automatically cease upon the living full time with another person in an intimate, cohabitating relationship. Tellingly, there were three drafts of the bill before its enactment that did not include the words "full time." Yet, in the enacted legislation amending Arkansas Code Annotated section 9-12-312, "full time" was inserted into the statute. We construe statutes so that, if possible, every word is given meaning and effect.[16] We construe the statute so that no word is left void, superfluous, or insignificant, and meaning and effect are given to every word in the statute, if possible.[17] We also construe the statute just as it reads, giving the words their ordinary and usually accepted meaning in common language.[18] To ignore the insertion of the words "full time" would render it meaningless. Therefore, we hold that, pursuant to Arkansas law, cohabitation is not enough for termination of alimony. It requires living *full time* with another person in an intimate, cohabitating relationship.

While cohabitation alone can be enough to terminate alimony pursuant to parties' agreement, it is insufficient to terminate alimony pursuant to Arkansas law. The cohabitation must be full time. Here, there is no contractual agreement as in *Collins* and *Klenakis* that deems cohabitation sufficient. Under the facts presented here and the applicable law, we hold that the circuit court erred in terminating Ryan's alimony obligation upon a finding that Sara cohabited with her boyfriend.

---

[16]*Gafford v. Allstate Ins. Co.*, 2015 Ark. 10, 459 S.W.3d 277.

[17]*Id.*

[18]*Id.*

Because we reverse the circuit court's order terminating Ryan's alimony obligation, we need not address Sara's argument as to the effective date of the termination.

Reversed.

THYER and WOOD, JJ., agree.

*Kristen Kimander Law*, by: *Kristen Komander*, for appellant.

*Walas Law Firm, PLLC*, by: *Breean "BW" Walas*, for appellee.