Cite as 2023 Ark. App. 385

# ARKANSAS COURT OF APPEALS

DIVISION II
№ CV-20-752

|  |  |  |
|---|---|---|
| | | **Opinion Delivered** September 13, 2023 |
| VICKY BASS HAYNES | | |
| | APPELLANT | APPEAL FROM THE GARLAND COUNTY CIRCUIT COURT [NO. 26DR-07-1156] |
| V. | | |
| | | HONORABLE F. RUSSELL ROGERS, JUDGE |
| BENTON NED BASS | | |
| | APPELLEE | AFFIRMED |

**KENNETH S. HIXSON, Judge**

This is an appeal from a divorce between appellant Vicky[1] Haynes (appellant or Vicky)

and appellee Benton Ned Bass (appellee or Ned) that has been in litigation since 2007. In

this appeal,[2] Vicky appeals from a divorce decree filed on January 24, 2014, and a series of

subsequent orders filed by the Garland County Circuit Court in favor of Ned. On appeal,

Vicky contends that (1) the circuit court erred in finding that the postnuptial agreement was

---

[1]We note that appellant's first name is also spelled as "Vicki" in some documents throughout the record.

[2]This is not the first time these parties have been before our appellate courts. On February 25, 2015, we dismissed an appeal without prejudice due to the lack of a final order. On May 26, 2016, the supreme court denied Ned's petition for writ of certiorari. After yet another premature appeal was filed, we dismissed the appeal without prejudice due to the lack of a final order in a published opinion on February 13, 2019. *Bass v. Bass*, 2019 Ark. App. 95.

valid and enforceable; (2) assuming that the postnuptial agreement was valid, the circuit court erred in not following the postnuptial agreement; and (3) the circuit court erred in the award of expenses to Ned and in the division of property based on the report of the special master. We affirm.

I. *Relevant Pretrial Pleadings[3] and Facts*

Vicky and Ned were married from 1981 to 1994. After their first divorce, they remarried in 1995. The parties' relationship again deteriorated, and on December 19, 2007, Vicky and Ned executed a postnuptial agreement in which both parties were represented by counsel. One week later, on December 26, 2007, Vicky filed a complaint for divorce against Ned. In her complaint, Vicky referenced the postnuptial agreement and asked that it be "properly administered." Ned answered Vicky's complaint for divorce and subsequently filed multiple amended answers and a counterclaim for divorce wherein he consistently requested that the postnuptial agreement be enforced. Vicky answered Ned's counterclaim and acknowledged the presence of the postnuptial agreement but requested that Ned's counterclaim be dismissed.

---

[3]The record reflects that the parties and the circuit court filed over 260 motions, orders, and other filings prior to the final hearing. Due to the voluminous number of filings, this opinion attempts to include only those portions of the pleadings that are pertinent to appellant's points on appeal.

After approximately three years of litigation, Vicky abruptly changed her course and position on the validity of the postnuptial agreement.[4]  During the first three years of litigation, Vicky alleged and argued that the postnuptial agreement was valid and enforceable.  However, on January 14, 2011, Vicky filed an amended complaint for divorce and alleged for the first time that the postnuptial agreement was "improper" and "should not be enforced."  Ned filed an answer and counterclaim wherein he denied that the postnuptial agreement was unenforceable and pleaded several affirmative defenses, including that Vicky had waived any right to contest the postnuptial agreement and was both judicially and equitably estopped from doing so.  Vicky answered Ned's counterclaim and again alleged the postnuptial agreement was invalid and unenforceable.

A few months later, Vicky again changed course.  Her then attorney, J. Joshua Drake, filed a pleading styled "Partial Withdrawal of Amended Complaint and Notice to Request Enforcement of the Post-Nuptial Agreement" wherein Mr. Drake stated on Vicky's behalf that "Plaintiff hereby withdraws all those portions of her Amended Complaint and all other pleadings where she challenges the validity of the post-nuptial agreement."  Vicky was now back to her original position that the postnuptial agreement was valid and enforceable.  Apparently, this pleading led to a deterioration and subsequent severing of the relationship

---

[4]The record indicates that Vicky retained and dismissed approximately twenty attorneys during this lengthy divorce proceeding, and for some period of time, Vicky represented herself pro se. Vicky's position regarding the validity of the postnuptial agreement appeared to vacillate depending on which attorney was representing her at that time.

with Mr. Drake as her attorney, and Vicky retained yet another attorney, Jack Wagoner III. In due course, Mr. Wagoner filed a second amended complaint wherein he alleged the following:

> 9. Plaintiff's prior counsel filed various pleadings regarding whether a document that the parties have been referring to as a Post Nuptial Agreement should be enforced. At trial, Plaintiff will not be proffering this agreement or seeking to prove its terms or validity. If Defendant seeks enforcement of this agreement, then the burden is on him to plead it and prove that it is enforceable.

It appears that Vicky was again alleging that the postnuptial agreement was invalid.

Ned's answer to Vicky's second amended complaint, as one would expect, alleged that the postnuptial agreement was valid and enforceable. However, Ned's answer raised a new issue that would become relevant in the future. Ned also alleged that the circuit court had already "determined the validity of the postnuptial agreement." He further requested that Vicky be ordered to reimburse him for the "payment of certain marital debts" and to reimburse him for "all sums paid for or on behalf of [Vicky], or her interest, since the separation of the parties."

The parties owned substantial assets located across several states. During the pendency of this case below (2007–2014), the circuit court[5] entered several relevant orders authorizing and distributing some of these assets. One of the assets was Bass Management,

---

[5]Judge Lynn Williams was the original assigned judge, and he recused himself from the case on January 25, 2011. Judge Russell Rogers was assigned on February 4, 2011, and remained the judge until October 9, 2020. Judge Ellen Brantley was assigned on October 12, 2020, and remained the judge throughout the remainder of the case.

Inc. (Bass Management), a corporation jointly owned by the parties. Bass Management owned and operated Brady Mountain Resort and Marina (Brady Mountain Resort) and Brady Mountain One Stop. Brady Mountain Resort was sold, and the sale closed shortly after the divorce complaint was filed. On April 8, 2008, the circuit court filed an order equally disbursing to Ned and Vicky[6] $2,734,270.36 each from the sales proceeds of Brady Resort.[7] On October 2, 2008, the circuit court further ordered that a check from Bass Management in the amount of $25,233.08 for closing proceeds be released to Vicky.

Carrying on, the record indicates that Brady Mountain One Stop[8] (owned by Bass Management) was failing to produce sufficient income to be profitable and was costing approximately $5,000 a month to maintain. Approximately three years later, Ned filed a motion for leave to sell Brady Mountain One Stop. The court granted the motion and ordered that the property be sold at public auction on August 23, 2010. At the auction, the bidding did not reach the stated reserve, which was the approximate amount of the mortgage debt on the property. However, Ned individually was the highest successful bidder and offered to purchase the property subject to the current mortgage in anticipation of paying it

[6]Other sales proceeds from the sale of Brady Mountain Resort that were in the registry of the court were subsequently paid to the Internal Revenue Service, one-half to pay the tax liability owed by Vicky for the year 2008 and one-half to pay the tax liability owed by Ned for the year 2008.

[7]Brady Mountain One Stop was not part of this transaction but was sold later during the litigation.

[8]Brady Mountain One Stop was the only remaining asset of Bass Management.

off or refinancing. Therefore, the circuit court filed an order confirming the public sale to Ned on August 19, 2013, and Ned became the sole owner of Brady Mountain One Stop subject to the mortgage free and clear of Bass Management's interest.[9]

At about the same time that the sale of Brady Mountain One Stop was going on, Ned filed a motion for contempt against Vicky regarding the Collierville, Tennessee, property. In the postnuptial agreement, the parties agreed that Vicky would purchase the Collierville residence as her sole property. The agreement did not require Ned to make any payments on the note and mortgage.[10] The record indicates that the original mortgage note on the Collierville property was debt against Ned, individually, and that as part of the agreement, Vicky agreed to refinance the debt solely in her name. Ned filed a series of motions for contempt alleging that Vicky had not made note payments for several months; approximately $51,000 was now due; and Vicky should be held in contempt. Ned made some payments on the notes to keep the notes out of default since the notes were in his name. While Vicky was between attorneys and representing herself pro se, she appeared for a hearing on the motions for contempt filed by Ned. In its September 10, 2013, order, the circuit court found Vicky in contempt for failing to pay the note and mortgage on her residence in Collierville in the amount of $51,000, which Ned had instead paid. It also found that she was in contempt of court for accessing a line of credit through the parties' joint bank account in the amount of $4,000. The court allowed her the opportunity to purge herself of contempt

---

[9]The order confirming the sale was entered over three years after the auction.
[10]See footnote 16 below.

6

by paying Ned $55,000 within seven days of the order and by making all future payments associated with the Collierville residence as ordered in its previous November 1 and November 3, 2010, orders. The circuit court further stated that if Vicky failed to pay, Ned would be entitled to a lien against the Collierville residence and that a receiver would be appointed to sell the residence.

Vicky did not pay Ned and continued not to pay the note and mortgage on the Collierville residence. On December 20, 2013, the circuit court revised its order to appoint a receiver to sell the property. Subsequently, the circuit court filed an order confirming the sale of the Collierville residence on January 30, 2014. The court's order stated that the parties did not "acquire any beneficial interest" after the sale. In fact, Ned paid the outstanding debt after the funds from the sale were applied, and Vicky was ordered to reimburse Ned $1,750 for her half of the auction fees.

## II. *The Final Divorce Trial*

After six years of litigation, a final divorce trial was held September 18–20, 2013. Vicky had retained another attorney by this time, Janie Evins. At the outset, Vicky's counsel raised the issue of whether the postnuptial agreement was enforceable in the following colloquy:

MS. EVINS: And then I guess the second matter would be that a prior judge, Judge Williams I believe, had indicated that at some point – I don't have the exact date for the order, but the parties would abide by the postnuptial agreement. I believe that's been to all our benefits if we could determine whether the Court is going to ask that the postnup be honored and that the parties' actions abide by the postnup and be determined accordingly.

7

THE COURT:    I would say that's a standing order.  I mean an order in effect.  The order is in effect right now.  That's after the reading.

MS. EVINS:    Okay.  Okay.  Then we're ready to go.

Despite Ms. Evins's representation and the circuit court's acknowledgment that there is an order stating that the parties would "abide" by the postnuptial order, we have found no such written order in the addendum, supplemental addendum, or record.  However, as explained below, we find that this alleged order is of no consequence.

At trial, approximately thirteen witnesses were called to testify about events that occurred over the previous seven years of litigation, and the trial exhibits totaled approximately 370 pages.   Instead of recounting all the evidence introduced at the trial, this opinion will summarize and review pertinent testimony that is relevant to the parties' briefed arguments in our analysis below.

Vicky testified that she had more recently lived in her residence in Collierville, Tennessee, before moving in with her mother.  She agreed that she entered into a postnuptial agreement shortly before she filed for divorce and that the agreement had stated that the parties intended to continue the marriage at the time the agreement was entered into.  She discussed the details of the postnuptial agreement and how the agreement designated the parties' property was to be distributed.

Vicky stated that the agreement required that one of their properties, Brady Mountain Resort, was to be divided equally.  However, she stated that it was her belief that when it was sold during the pendency of this case, Ned received an amount that was higher than the $3.2

8

million she received. She further complained that, although she received $15,000 a month until the sale of Brady Mountain Resort, the check she received each month was from Bass Management rather than from Ned's personal account. She further stated that Bass Management was to pay all her attorney's fees under the postnuptial agreement unless it was alleged that the fees were excessive, in which case, the parties were to agree to mediate any dispute. Vicky testified that she would be willing to agree to accept the sum of Ned's attorney's fees to avoid any dispute about whether her fees were excessive.

Vicky claimed that Ned had been hiding assets. She stated that the parties had owned cattle before they separated and that she did not see cattle the last time she was on the property. Vicky explained that the parties had an interest in several companies that they had formed, including Bass Management, NV International, Inc. (NV International), Winston Cup, Inc. (Winston Cup), and Grey Wolf Development, Inc.[11] (Grey Wolf). However, she stated that she had not received a salary from these entities pending divorce. She asked the court to grant her half of the net rental income that Bass Management had received and half of any income that NV International and Winston Cup had received.

Vicky asked the circuit court to sell any property that the parties owned through any entity. However, she did not want to sell the property next to their marital home that she alleged had been conveyed to her son by NV International. She wanted her son to be able

---

[11]Our record reflects that this property was sold during this litigation, and on October 2, 2008, the circuit court filed an order equally distributing funds from the sale of the parties' interest in real property to Vicky and Ned; they each received $9,208.38 from that sale.

to keep that property. Vicky acknowledged that a convenience store, Brady Mountain One Stop, had been sold. However, she made allegations regarding a secret lease and a nonexistent mortgage that Ned had wrongfully claimed. She alleged that she did not receive her fair share of this property and even testified that she was suing the buyer of that property. Vicky also wanted to be awarded the Collierville home, despite the fact that it had been already ordered sold, and to be reimbursed for any improvements she had made to the Collierville home.

On cross-examination, Vicky admitted that she received $3.2 million from the sale of Brady Mountain Resort; $950,000 for The Landing[12] marina in Tarpon Springs, Florida; and $125,000 for her stock in Log Cabin Liquor, even though she first denied it. She agreed that if Ned had purchased something after the postnuptial agreement, it was his to keep under paragraph 13 of the postnuptial agreement as long as he showed which assets were used to purchase the property.

Regarding Brady Mountain One Stop, Vicky denied that she had been notified by her attorney that it was sold at public auction. She also denied that she should be responsible for any of the debt service on the property but instead claimed that she was entitled to a share of the income that the business realized during the pendency of the divorce. Vicky denied that another one of her attorneys shared with her the payment coupons for the debt service of that property. Vicky further denied that the attorney's fees mentioned in the

_____

[12]This property was sold in 2007 before the parties executed the postnuptial agreement.

10

postnuptial agreement referred to the closing fees that would be spent by her for the closing sale of Brady Mountain Resort, even though the sale of that property was contemplated at the time the postnuptial agreement was entered.

Vicky stated that she had paid the taxes and mortgage on the Collierville residence from the moment she moved in until the time she stopped paying and was held in contempt. Even though the postnuptial agreement did not say that Ned would be responsible for the loans on the home, Vicky testified that because it stated that the home would be her sole residence, she thought that Ned should be responsible for paying the mortgage. She claimed she only stopped paying the mortgage because she "ran out of money." However, Vicky admitted that she drove a new Mercedes and has paid her other bills. Vicky claimed that she had to sell all her jewelry, luggage, and clothes and now lives with her mother because she did not have enough money. She denied that she had a lockbox in California or that she had any accounts with her mother, sister, or former fiancé.

Vicky testified regarding her relationship with her expert witness, James Recouper. She admitted that she currently had a business relationship with Mr. Recouper and that he ran a cabin-rental business. She denied that her business relationship included her buying rental cabins after she received money from the divorce. Vicky stated that Mr. Recouper was her expert and that he "discovers" things for her. She explained that she had paid him $2,500, but he returned $2,000 to her even though he had "over 100 hours into this" and had been to Florida to investigate for her. Vicky denied that she had a romantic relationship with Mr. Recouper and denied that he spent the night in a hotel room with her despite the

hotel records that were admitted into evidence. She claimed that she stayed in the hotel room with her daughter and granddaughter for two nights and that Mr. Recouper spent three nights in another room. She testified that she had no idea why there were no hotel records of Mr. Recouper staying in another room.

Vicky admitted that she had not paid any marital debt service for the marital residence, the farm, or Brady Mountain One Stop. However, she stated that maybe if she had received money, she could have paid something back. That said, she stated that she did not count what Ned claimed he had paid because he had not provided her with any receipts. She stated that she was not willing to pay half of the debt service on the marital home because Ned's girlfriend was living in the home. She stated that Ned's girlfriend should pay for it. Regarding the debt service on the other properties, she claimed that she had never received a benefit from those properties and therefore should not be held responsible. She claimed that Ned should also be responsible for any mortgages that he forged her name on and be personally responsible for a tax lien that is on the marital home.

Vicky's brother-in-law, Charles Huff, testified that he thought Vicky was a credible person. He admitted that he had a disagreement with Ned approximately twenty years ago when Ned failed to give him a fee from Ned's sale of a log home to one of Charles's partners.

Patricia Jane Haynes, Vicky's mother, testified that she lived in Collierville, Tennessee. Ms. Haynes testified that Vicky lived with her and that she was financially assisting Vicky as well. She knew that Vicky had previously been living at a home in Collierville and that Vicky had made several improvements to the home over the years. Ms.

12

Haynes testified that she thought Ned was a dishonest person and that he had even broken her finger in the past.

Elizabeth Huff, Vicky's sister, also testified that she was concerned with Ned's behavior and did not think he was a truthful person. She remembered that the parties had cattle on their marital property and that Vicky had made improvements to the home in Collierville. On cross-examination, Elizabeth admitted that Vicky had given her a Lincoln Navigator for her birthday after the parties' separation. She also testified that Vicky took her on trips to Greece and Hawaii.

James Recouper testified that he is a real estate appraiser and that he had been licensed to appraise property in Florida, Tennessee, Kentucky, and Arkansas. He testified that he also owned a log-cabin-rental business in Gatlinburg, Tennessee. He explained that Vicky had asked him to assist her in securing documents or appraisals of some property, but he admitted that he had not done any appraisals for this case and that he had never testified as an expert in Arkansas. Mr. Recouper testified that he reviewed documents for several of the properties in this case. He stated that he could not perform an appraisal of the Collierville residence because Vicky's name was not on the trust deed. Mr. Recouper also stated that he reviewed the documents from the sale of Brady Mountain One Stop. He stated that he never found a recorded mortgage but acknowledged that the circuit court had ordered it sold for at least the amount of the mortgage. He observed that Ned had purchased the property at the judicial sale for $320,000. Mr. Recouper theorized that Ned had

quitclaimed the property to Bass Management before it was then sold to a third party who successfully operated the business and later sold it to someone else.

On cross-examination, Mr. Recouper testified that he did not know Vicky was represented by counsel when the properties he reviewed were sold. He denied that he stayed in a hotel room with Vicky. He claimed that he rented two separate rooms and did not know why the hotel did not have a record of it. He denied that he was working on a contingency fee based on the outcome of the divorce. He explained that there was no understanding as to how much he would receive. Instead, his fee would be based on the time and difficulty of each appraisal because of Vicky's financial situation.

Vicky rested her case.

Ned called Jennifer Carradine as a witness. Ms. Carradine testified that she is a manager at the Park Hotel in Hot Springs, Arkansas. She testified that the hotel records indicate that the original room that was rented by Mr. Recouper and Vicky, room 301, had a queen-size bed. Vicky then had the room upgraded to a king mini suite because she had a large dog. Ms. Carradine was not at the hotel when Vicky checked in, but she remembered seeing Vicky later with her large dog. She never saw Mr. Recouper or Vicky with any other female or adult. She did not have any records of any other room being reserved by Mr. Recouper.

Steve Demott testified that he is an attorney and that he owns a title company. He explained that Ned hired him to assist with the sale of Brady Mountain Resort, which was owned by Bass Management. He explained that he was satisfied that both Ned and Vicky

14

understood the transaction and that Vicky was represented by her own attorney at the time. The buyers required that not only Bass Management sign the certificate of seller in its corporate capacity but that Ned and Vicky also personally sign as the sole shareholders. Mr. Demott explained the sale process and described the executed documents in detail.

Ned testified on his own behalf. Ned stated that he still lived in the marital home. He recalled entering into a postnuptial agreement with Vicky at her request. He further testified that he had no idea that Vicky would file for divorce shortly after he signed the postnuptial agreement. He explained that Vicky had been represented by attorney Sky Tapp at that time and that Mr. Tapp also represented her regarding the sale of The Landing, for which Vicky received $950,000.

Ned explained in detail the various properties and entities in which the parties had an interest over the years. Ned stated that Bass Management had owned Brady Mountain Resort and Brady Mountain One Stop. He went on to explain that those properties were disposed of and the funds distributed by the circuit court. Vicky and Ned jointly own the marital home and adjacent farm. He explained that there were some surviving cows left on the property. Ned stated that the parties also purchased land that was adjacent to the marital home and that some of the land was owned by NV International, a farming company created and owned jointly by Ned and Vicky. None of the property owned by NV International had been sold at the time of the divorce trial. He acknowledged that the postnuptial agreement stated that certain parcels were to be given to the parties' children, and he asked the circuit court to award that property to the children as provided in the postnuptial agreement. Ned

15

stated that he thought the other parcels needed to be sold. However, he also explained that the parties had debt on some of the parcels and that Vicky had refused to help him pay any of the marital debt while their divorce was pending. Therefore, he had been paying debt service on a monthly basis for their various properties and entities pending their divorce. He requested that the circuit court award him half of the money he had expended as a lien against any remaining real property when it is sold.

Regarding the Collierville residence, Ned stated that he was never able to sign a quitclaim deed to convey the property to Vicky because Vicky refused to pay off the note on the home, and his name was on the note and the mortgage. He explained that the note was in his name because Vicky was unable to qualify for a loan. They had agreed that she would pay the note from the Brady Mountain Resort sales proceeds so he could convey the property to her, but she then failed to do so. Ned claimed that the residence had been a financial burden to him and that he had just paid the taxes on the property. Ned also explained that he assisted Vicky in her move to Collierville. He paid to move five truckloads of items that she took with her.

Regarding the attorney's fees referenced in the postnuptial agreement, Ned testified that the provision did not contemplating the payment of attorney's fees for a divorce. Rather, he claimed that the fees were "totally about Bass Management, selling Brady Mountain Resort, Brady Mountain One Stop which Brady Mountain One Stop had sold." He explained that the parties were anticipating the sale of Brady Mountain Resort, which

was owned by Bass Management.  Therefore, Ned thought Vicky received the money she was owed and thought any attorney's fees she incurred in the divorce was at her own discretion.

Ned denied that he had concealed or hid any assets as Vicky alleged.  Ned did, however, admit that he forged Vicky's name on some documents when the bank required him to execute new documents so that the bank did not foreclose on the parties' property after Vicky had refused to sign the documents.  Ned testified that Log Cabin Liquor was not mentioned in the postnuptial agreement because Vicky had previously sold her 25 percent ownership in Log Cabin Liquor.

On cross-examination, Ned admitted that he did not personally pay Vicky's moving expenses from his personal bank account but that Bass Management had actually paid them.  He agreed that he had a girlfriend who was living with him in the marital home.  She moved into the home in October 2008.  She does not pay him rent but takes care of the home since he travels at least three days a week.  Ned described and provided details regarding the various loans and other debts the parties owed.  He reiterated that Bass Management did not have any money and that Bass Management no longer had a bank account.  He also testified that NV International no longer had a bank account but that Winston Cup still had an account with Summit Bank and First National Bank for credit cards.  He had a manager handle those accounts.  Because Winston Cup did not have any cash flow, he said he had to make up the difference each month.  Ned rested.

After Ned rested, Vicky's counsel recalled Mr. Recouper as a witness.  He testified that he discovered a credit-card transaction that his business paid $170.03 for his hotel stay

for three nights.  On cross-examination, he also stated that he paid for a separate room for Vicky for only two nights, which was $276.  He did not have an explanation as to why his room total was less, even though he spent another night.

Joel Nelson Hickson testified that he had worked for Brady Mountain Resort.  He testified that Ned would routinely pay him in cash and would put cash in the safe rather than deposit it in the bank.  Mr. Hickson also testified that Ned had created a second set of books to show the U.S. Army Corps of Engineers.  On cross-examination, Mr. Hickson denied that he was testifying voluntarily but was subpoenaed by Vicky.  He denied that he had received any gifts from Vicky in exchange for his testimony.

Vicky testified that she was not allowed to look at the loans for the Collierville residence and was not aware of transactions that occurred in which Ned signed her name.  She disagreed with Ned's testimony that she would not cooperate with him.  She explained that she wanted to "get rid" of marital assets rather than accumulate them.  Finally, Vicky testified that the $15,000 a month that she received before she received the Brady Mountain Resort proceeds was from Bass Management and not from Ned's personal account.

The court took the case under advisement, and on January 24, 2014, a decree of divorce was entered.  The decree stated the following pertinent findings:

4.      The parties executed a document titled "Post Nuptial or After Marriage Agreement" ("the agreement") in December of 2007.  The parties were each represented by counsel who also signed and approved the agreement and the agreement was witnessed and acknowledged.  The agreement was admitted into evidence as Plaintiffs Exhibit No. 1.  At Trial, neither party contested the validity of the agreement.  Both parties seek to enforce the agreement according to their post-

18

trial briefs, and the Court finds and Orders that the agreement is valid and enforceable with respect to the property and other matters set out in the agreement.

5.      There is certain marital property of the parties which is not addressed in the agreement of the parties and which is subject to division by the Court, as follows:

a).      The marital residence of the parties is located at 368 North Pearcy Road, Garland County, Arkansas and title is held jointly by the parties. The marital residence is subject to a mortgage in favor of Regions Bank in the sum of approximately Three Hundred and Thirty-Five Thousand Dollars ($335,000) at the time of Trial.  The 37.82 acres adjacent to the marital residence is also owned jointly by the parties.  At the time of Trial this property was subject to a mortgage in favor of Diamond Bank with a principal balance of approximately Three Thousand Two Hundred Dollars ($3,200.00).

b).      19.86 acres adjacent to the marital residence, also owned jointly by the parties.  There is no mortgage on this acreage.

c).      115.09 acres adjacent to the marital residence.  This acreage is titled in NV International Investments, Inc.  NV International Investments, Inc. is a corporation, the stock of which is owned jointly by the parties.  The corporation is marital property.  This acreage is subject to a mortgage in favor of B.J. Speers with a principal balance at trial in the sum of approximately Seventy Eight Thousand Dollars ($78,000.00).

6.      The parties shall be allowed a period of six (6) months from the date of this decree to sell the above described real property privately.  However, in the event the property remains unsold after six (6) months, it shall be sold at public auction to the highest bidder.  The clerk of this court is hereby appointed commissioner for such sale.  Sale shall be advertised in a newspaper of general circulation in Garland County, Arkansas, by at least one insertion, not less than ten (10) days prior to the date of sale. Sale shall occur inside the front door of the Garland County Courthouse.  In the event the successful bidder is the Plaintiff or a public bidder, such bidder shall provide surety for the bid in the amount of ten percent (10%) of the bid, cash or certified funds, or a bank letter of credit or corporate surety bond.  The closing shall occur within ninety (90) days of sale, with interest at five (5%) percent per annum.  In the event the Defendant is the successful bidder, no bond shall be required; rather, the lien of the Defendant for his payment of debt service, insurance, taxes and maintenance shall excuse bond on the part of the Defendant.

19

7.     The real property identified in Paragraphs 5(a) through 5(c) hereinabove shall be sold.  From the proceeds of the sale, the expenses of sale and mortgage indebtedness shall be paid and the balance of the proceeds paid into the Registry of the Court.  From such proceeds, the Defendant shall be compensated for one half (1/2) of debt service paid by him during the pendency of this divorce and up to the date of distribution of final sale proceeds, and shall also be compensated for one half (1/2) of insurance, taxes and maintenance paid during such time.  The Court hereby appoints [CPA] Marla Lammers as receiver for purpose of receiving information and documentation of the Defendant in order to verify debt service, insurance, taxes and maintenance paid by him.  The receiver shall prepare and submit to the Court a report indicating the amount determined by the receiver to accurately establish debt service, insurance, taxes, and maintenance paid by the Defendant while this divorce has been pending and up to the date of the report.  The Court shall receive and approve the report of the receiver, whereupon the Defendant shall receive reimbursement for one half (1/2) of the debt service, insurance, taxes, and maintenance from the funds held in the registry of the Court.  The remaining balance shall be divided equally between the Plaintiff and Defendant.

8.     The 62.96 acres adjacent to the marital residence is subject to the agreement of the parties and shall remain subject to the agreement. [13]

9.     Winston Cup, Inc. is a domestic corporation created in 1999 and it is marital property.  Winston Cup, Inc. is not mentioned in the agreement of the parties and thus is divisible as marital property.  The stock of the corporation shall be sold, at public auction to the highest bidder.  From the proceeds of such sale, the corporate debt owed First National Bank in approximate principal sum of Five Hundred Fifty-Six Thousand Dollars ($556,000.00) shall first be paid.  The expenses of sale should next be paid, then the Defendant shall be reimbursed for one half (1/2) the debt service paid, for Winston Cup, Inc., while this divorce has been pending.  The court appointed receiver . . . shall verify and report to the court for approval the amount of such debt service.  The stock of Winston Cup, Inc. shall be sold and advertised along with the real property, as set out hereinabove.  In the event the Plaintiff is the successful bidder, or in the event a public bidder is successful, such bidder shall provide surety for the bid in the amount of ten percent (10%) cash or certified funds the day of sale, or a bank letter of credit or a corporate surety bond.  The closing shall occur within ninety (90) days of sale, with interest at five percent (5%).  Because the Defendant has personally guaranteed the loan and because of the lien of the

---

[13]This separate 62.96-acre tract was apparently intended to be gifted or transferred to the parties' children in the future.

Defendant for debt service during the pendency of this divorce, no bond or security shall be required of the Defendant.

10.     The personal property of the parties, the surviving longhorn cows and two (2) tractors registered in the name of the NV International Investments, Inc. shall likewise be advertised and sold at public sale, at the same times as the real estate and stock of Winston Cup, Inc.  The successful bidder shall provide security for payment by paying ten percent (10%) cash or certified funds the day of the sale, or by bank letter of credit, or by corporate surety bond.

11.     The residence located in Collierville, Tennessee has been ordered sold.

12.     Bass Management, Inc. operated Brady Mountain Resort, the family business of the parties. Bass Management, Inc. also operated a convenience store, gas station, known as Brady Mountain One Stop.  At the time of the parties' agreement, Brady Mountain One Stop had been sold by the parties and is therefore not mentioned in the agreement of the parties.  At the time of the parties' agreement, Brady Mountain Resort was under contract of sale, as reflected in the parties' agreement.  After the agreement was executed, the sale of Brady Mountain Resort was closed and the parties each received one half (1/2) of the net proceeds, more than Three Million Dollars ($3,000,000.00) each.  Also after the parties' agreement, the buyer for Brady Mountain One Stop defaulted and the business was repossessed while this divorce was pending.  During the course of the divorce, the Brady Mountain One Stop was the source of substantial dispute between these parties.  Brady Mountain One Stop was ordered sold and this court has confirmed the sale.  Nothing more remains to be done with respect to Brady Mountain One Stop or Bass Management, Inc.

13.     Log Cabin Liquor, Inc. is a corporation which was originally owned one half (1/2) by the Plaintiff and Defendant and one half (1/2) by Rebecca and Robert Freeman.  The evidence was clear that Vicky Bass sold her stock in the corporation to Rebecca Freeman for One Hundred Twenty Five Thousand Dollars ($125,000.00) February 16, 2007, evidenced by Defendant's Exhibit No. 2.  The contention of the Plaintiff at trial was that the Defendant's interest in Log Cabin Liquor, Inc. was not disclosed to her and that under the terms of the agreement of the parties the Plaintiff was therefore entitled to receive the Defendant's interest in that corporation.  However, the contention of the Plaintiff that Log Cabin Liquor, Inc. was "undisclosed or hidden" is clearly wrong.  The Plaintiff was fully aware of Log Cabin Liquor, Inc. at the time of the agreement; she sold her interest in the business months before signing the agreement and received One Hundred Twenty Five Thousand Dollars ($125,000.00) as shown by the undisputed evidence.

21

14.     The evidence at trial was clear with respect to the two Florida marinas. The Parties owned one half (1/2) of the stock in Sea Bass Marine Corp., which operated a marina known as The Landing at Tarpon Springs. This marina was sold in 2007 and the Plaintiff and Defendant each received Nine Hundred Fifty Thousand Dollars ($950,000.00) from the sale. The contention of the Plaintiff at trial and in her brief was that because of a claimed irregularity if the documentary stamps, there was no sale. However, the Plaintiff and Defendant were both represented by counsel, attended closing, and received the money. There was no evidence whatsoever that the Defendant maintained any interest in this marina after the closing. The claims of the Plaintiff with respect to this marina are not supported by any evidence.

15.     The evidence showed that June 1, 2011, Sea Bass, LLC was created as a Florida limited liability company (Defendant's Exhibit No. 21). This LLC currently operates a marina known as "Belle Harbor." The evidence was clear and unrefuted that this marina business began long after the agreement of the parties. The agreement provides that property acquired after the agreement is the sole and separate property of the person who acquires it. The validity of the post nuptial agreement was not contested by the parties; in fact, both seek to have it enforced. There was no creditable evidence to support a claim to Sea Bass, LLC or Belle Harbor Marina by the Plaintiff.

16.     The Plaintiff claims she is entitled to money from a corporation of the parties, Grey Wolf Development, Inc. She bases this claim on a check received in July of 2008. However, this divorce was pending in July of 2008 and the money received was the subject of dispute in this divorce, while the Plaintiff was represented by a different attorney, and by a different judge. The Court adjudicated the matter and an order disposing of the Grey Wolf funds was entered herein October 2, 2008. The claim of the Plaintiff to funds related to Grey Wolf Development, Inc. is therefore denied.

17.     The Plaintiff claims and the Defendant acknowledges that he signed her name to certain extensions and renewals of the parties' mortgage loans during the six (6) years this litigation has been pending. Clearly, Mr. Bass should not have signed the Plaintiffs name to those documents and the Court disapproves of it. However, no evidence was presented which showed or suggested that any financial harm to the Plaintiff occurred as a result. The Court denies the claim of the Plaintiff that the Defendant should be made solely responsible for those loans as a result of his actions.

18.     The Plaintiff contends that there were hidden or undisclosed assets. There was little if any evidence to indicate the Defendant had hidden, squandered or

depreciated the value of any of the marital property. The Plaintiff makes these claims with respect to The Landing at Tarpon Springs, Grey Wolf Development, Inc., Log Cabin Liquor, Inc., Belle Harbor Marina and Brady Mountain One Stop. The evidence was clear that the Plaintiff knew of and was directly involved in each of those businesses. The Landing sold before the agreement and Plaintiff received Nine Hundred and Fifty Thousand Dollars ($950,000.00). The Grey Wolf Development, Inc., issue had already been adjudicated by this court. The Plaintiff sold and was paid for her interest in Log Cabin Liquor, Inc. before the agreement. Belle Harbor Marina did not exist until 2011, years after the agreement of the parties. Brady Mountain One Stop was sold at the time of the agreement and has been previously adjudicated. The court denies the Plaintiff is entitled to money or property based on alleged hidden or undisclosed assets.

19. The actions and inactions of the Plaintiff have cost her and the Defendant a great deal of money. Throughout the years that this divorce has been pending the Defendant has paid debt service and related expenses to preserve the marital assets of the parties, without contribution from the Plaintiff. The Defendant is entitled to recover one half (1/2) of the expenses he incurred in "keeping things afloat" for the past six (6) years, as set out hereinabove.

20. The Plaintiff seeks thirty thousand ($30,000.00) from the Defendant because certain payments made to her pursuant to the agreement of the parties were paid from Bass Management, Inc., and not from the Defendant individually. The agreement of the parties was executed with the sale of Brady Mountain Resort under contract. Brady Mountain Resort was the source of income to the parties at the time of the agreement. The agreement contemplated that the payments to the Plaintiff were to come from Bass Management, Inc., which operated the Resort until the sale was closed. The Court denies any adjustment to the payments made because they came from Bass Management, Inc.

21. Each party shall bear their own costs, attorney fees and litigation expenses.

Vicky appealed. However, this court dismissed the appeal without prejudice on February 27, 2015, due to lack of a final order.

III. *Relevant Posttrial Pleadings and Facts*

On remand to the circuit court, Ms. Lammers compiled a report for the purpose of settling the financial accounts in this case and submitted it to the court on May 20, 2015. She attached multiple exhibits: exhibit A—"Summary of Expenses Paid by Ned from December 26, 2007, to August 31, 2014"; exhibit B—"Total Estimated Future Outlay for Debt Service and Expenses"; exhibits C and D—"Schedules of Expenses Paid by Ned for the One Stop Store"; exhibit E—"Schedule of Garland County Property and Real Estate Taxes Paid"; and exhibit F—"Summary of Monthly Maintenance Expenses for 368 North Pearcy Road." Ms. Lammers further indicated in her report that she sent a letter to Vicky's counsel requesting information but that she received no response. Ms. Lammers concluded that Ned was entitled to be reimbursed $850,464.52 from Vicky for the period of time from December 26, 2007, through August 31, 2014. She additionally determined that Vicky needed to pay Ned $7,073.21 a month until the marital property was sold and monthly debt service was no longer required as her portion of the expenses.

Vicky objected to Ms. Lammers's report. Vicky specifically argued that portions of Ms. Lammers's report were "outside the scope of her review." Ned filed a response disagreeing with Vicky's arguments and quoted the circuit court's ruling in the divorce decree:, "The Defendant is entitled to recover one half (1/2) of the expenses he incurred in 'keeping things afloat' for the past six (6) years, as set out hereinabove."

Thereafter, on August 12, 2015, having retained new attorneys, Rachael E. Putnam and Andy Taylor, Vicky filed a motion for new trial or, in the alternative, motion to amend the court's findings of fact. Importantly, this motion was filed nearly eighteen months after

24

the divorce decree had been filed.  In the motion, Vicky argued that she was entitled to relief due to irregularities in the proceedings and errors of law.  *See* Ark. R. Civ. P. 59(a)(1) & (8).  Specifically, she challenged Judge Williams's reluctance to recuse himself from the matter as well as the conduct of Jack Wagoner, her former attorney in the matter.  Vicky also asked the circuit court to consider amending its findings of fact pursuant to Arkansas Rule of Civil Procedure 52.  She argued that the postnuptial agreement was invalid because the stated intent of the postnuptial agreement is contrary to the language of the agreement and to the parties' actions, the postnuptial agreement lacked consideration, and Ned failed to disclose all his assets.  Alternatively, Vicky argued that the divorce decree is "outside the scope of the postnuptial agreement."  Ned objected to Vicky's motion and argued that the motion was untimely.

On September 23, 2015, Vicky filed a supplemental motion for new trial or, in the alternative, motion to amend the court's findings of fact.  In this supplemental motion, she repeated some of her previous complaints and added more specific complaints regarding Ms. Lammers's report and attached documents in support of her supplemental motion.  Ned filed a response on October 7, 2015, and requested that the motion be dismissed.  In an amended response and supporting brief filed on February 16, 2016, Ned primarily argued that Vicky's motions were untimely and deemed denied, and he raised arguments that were not first raised at trial.  Vicky filed her reply on March 4, 2016, to which Ned filed a surreply and brief in support on March 15, 2016.

Vicky additionally filed a combined motion to strike the special master report, motion to disqualify Marla Lammers for a conflict of interest, and motion to disgorge Marla Lammers's fees on June 17, 2016. Vicky argued that Ms. Lammers was biased and had a "pecuniary relationship" with Ned that clouded her findings. She further criticized Ms. Lammers's report and requested that the circuit court order Ms. Lammers to refund her fees. Ned responded and requested that these motions be denied.

A hearing was held on July 1, 2016, regarding Vicky's June 17, 2016, motion. At this hearing, Vicky was represented by attorneys Rachael Putnam and Austin Rainey of Memphis, Tennessee. Ms. Lammers testified that she is a certified public accountant and that she was aware of Vicky's motion to strike her report and to disqualify her. Ms. Lammers testified that she does have a number of different business clients to whom she offered her tax preparer professional services; however, she did not have any ownership interests in the businesses as Vicky alleged. She further testified that she did not think there was anything she had done that would be cause to disqualify her from serving as a special master in this case. Nevertheless, Vicky's counsel argued that there was an appearance of impropriety and questioned Ms. Lammers's neutrality. After hearing oral argument, the circuit court orally ruled that it was denying Vicky's motion to strike Ms. Lammers's report.

Although the circuit court heard oral argument on some of the other pending motions, the hearing was continued until December 13, 2016. In the meantime, on July 19, 2016, Vicky filed yet another supplemental memorandum of facts in support of her motion for new trial. In it, she acknowledged that her trial counsel had erroneously stated to the

circuit court that there had been a previous order upholding the validity of the postnuptial agreement. She blamed this mistake on her previous attorney, alleging that her former attorney had failed to release all her files to her trial counsel. Vicky argued that she was entitled to a new trial because the parties were under the mistaken belief that the postnuptial agreement was valid. She further argued that there were multiple other factual errors in the divorce decree. Ned responded and argued that Vicky's memorandum was not a "supplemental pleading" and that her argument was "nonsense." Therefore, he requested that it be summarily denied.

Vicky further filed an affidavit from CPA Sidney A. Goldstein on August 31, 2016. In his affidavit, Mr. Goldstein stated that he had concluded that the marital estate totaled $15,772,900 on the basis of an unsworn written representation Ned had made in August 2007, prior to the parties' filing for divorce. He further concluded that Vicky was entitled to half of the marital estate and that she had failed to receive $2,960,769 that he opined she was entitled to receive. Finally, he disagreed with Ms. Lammers's report and stated that she lacked the necessary financial information to accurately report to the circuit court what, if any, reimbursement was owed to Ned.

At the December 13, 2016, hearing, the parties presented their remaining testimony and oral argument on the pending motions, including Ned's motion to confirm the report and set sale, Vicky's objections, and Vicky's motion for new trial or, in the alternative, motion to amend the court's findings of fact. The parties offered the testimony of two experts, Ms. Lammers and CPA Goldstein.

Ms. Lammers testified that she is a practicing CPA in Hot Springs, Arkansas, and that she was appointed by the circuit court to be a receiver in this matter. She explained that she reviewed documents and created a report for the court itemizing payments that were made to "keep the marital estate afloat." She requested information from both parties and received information from Ned that she compiled into reports that she presented to the circuit court. Ms. Lammers stated that Vicky did not provide any records despite her requests. She testified in detail about her method and reasoning for making the report calculations. Ms. Lammers stated that she "felt like [she] had a broad charge" from the language in the divorce decree and included anything that was a "benefit to the marital estate" in her report. She further described each offered exhibit in detail. She explained that she wrote a "c" next to the confirmed expenses for which she had supporting documentation, such as a receipt or canceled check. In other instances, she wrote "unconfirmed" next to the expenses where she knew the "expense happened" and was "documented" but that she did not have a canceled check or other corroborating evidence.

On cross-examination, Ms. Lammers admitted that not every expense she included was specifically paid out of Ned's personal account. She explained that she did include paid expenses that benefited the marital estate that originated from borrowed money or another entity. Vicky's counsel questioned Ms. Lammers about specific items that were included in the report and Ms. Lammers's rationale for including them. Ms. Lammers also admitted that she did not have certain tax returns and schedules to reconcile and include the alleged revenues for NV International, Winston Cup, and Bass Management that Vicky's counsel

28

referred to during the hearing. Therefore, Ms. Lammers agreed that her report as presented may not be accurate because she did not have those documents.

Mr. Goldstein testified that he also reviewed the financial documents and spoke with Vicky. He explained that he had prepared the August 31, 2016, affidavit, which was admitted into evidence without objection. During his testimony, Mr. Goldstein reiterated the statements and conclusion he made in his affidavit. He explained that after hearing Ms. Lammers's testimony, he thought his concerns were validated. He disagreed that any expenses should be included in the calculations unless they were specifically paid from Ned's personal bank account. On cross-examination, Ned's counsel questioned Mr. Goldstein regarding his reliance on an unsworn financial statement that was written by Ned before the filing of divorce and whether the figures represented the fair market value of the assets. Mr. Goldstein stated that he did not "presume people give a financial statement that's a lie." Even though he acknowledged that certain assets—specifically, Seabass Marine—listed on the financial statement had already been sold, Mr. Goldstein disagreed that it needed to be subtracted from his calculations. Mr. Goldstein admitted that he received a $10,000 retainer fee from Vicky for his services.

On redirect, Mr. Goldstein testified that he gave Vicky "credit" for all amounts that she received in cash from the sale of Brady Mountain Resort and the sale of Seabass Marine. He further stated that he "st[oo]d by [his] affidavit."

The circuit court ultimately denied Vicky's motions in an order filed on January 27, 2017. In this order, the circuit court made the following pertinent findings:

1.     The Defendant's Motion for Cash Bond, for Attorneys Fees and for Judgment by Default filed on September 8, 2015 is granted.  The Plaintiff shall post a surety bond with the Clerk of this Court in the sum of $75,000, within 10 days following entry of this Order.

2.     The Defendant's Motion for Plaintiff to Begin Payments for Debt Service and for Judgment by Default filed on September 8, 2015 is granted in part. The Plaintiff shall pay to the Defendant the sum of Six Thousand Seven Hundred Sixty Three Dollars and 56/100 ($6,763.56), representing her one-half (1/2) portion of the monthly debt service for the marital property remaining to be divided in this action, plus Three Hundred Nine Dollars and 65/100 ($309.65) representing her one-half (1/2) portion of one-twelfth (1/12) of the annual outlay for the primary residence, cattle farm and NV International Investments, Inc. corporate expenses. The Defendant shall continue to pay the debt service to the lenders in full.  The Plaintiff shall be obligated to pay the monthly sum of Seven Thousand Seventy-Three Dollars and 21/100 ($7,073.21) on the same day of each month thereafter until the property is sold and the monthly debt service is no longer required.

. . . .

4.      The Plaintiff's Motion to Strike Special Master Report, Motion to Disqualify Marla Lammers, and Motion to Disgorge Marla Lammers's Fee filed on June 17, 2016 is denied.

5.     The Plaintiff's Motion for New Trial, or in the Alternative, Motion to Amend the Court's Findings of Fact filed on August 12, 2015, the Plaintiff's Supplemental Motion for New Trial, or in the Alternative, Motion to Amend the Court's Findings of Fact filed on September 23, 2015, and the Plaintiff's Supplemental Memorandum in Support of Wife's Motion for New Trial, or in the Alternative, Motion to Amend the Court's Findings of Fact filed on July 19, 2016 are denied.

6.     The Defendant's Motion to Confirm Report and Set Sale filed on June 23, 2015 is granted.  Pursuant to the Decree of this Court entered herein on the 24th day of January, 2014, certain marital property of the parties is to be sold at public auction.  The report by Marla Lammers, CPA should be and is hereby approved as presented, except for the required revisions set forth hereinbelow more specifically. The public auction of the parties' property as outlined in the Decree of Divorce dated January 24, 2015, should be set for the 27th day of April, 2017, at 10:00 . . . a.m., which is approximately ninety (90) days from the entry of this Order.  No proceeds shall be distributed until specifically approved by this Court.

7.	The Special Master, Marla Lammers, is hereby Ordered to amend her Report to include revenue for NV International Investments, Inc., Winston Cup and Bass Management, Inc. during the accounting period as shown by the tax returns and K1's.  In addition, the Special Master is hereby ordered to amend her Report to identify any instance when an expense was paid by NV International Investments, Inc., Winston Cup and Bass Management, Inc., with a brief explanation, including what was paid, the amount and the entity which has paid the expense.

Vicky filed a notice of appeal on February 24, 2017.  However, we dismissed the appeal without prejudice due to the lack of a final order in a published opinion on February 13, 2019.  *Bass v. Bass*, 2019 Ark. App. 95.  The March 5, 2019, mandate ordered Vicky to pay Ned $500 for brief costs in the appeal.

While Vicky's appeal was pending, she apparently retained another attorney, Danny Crabtree.  On March 18, 2019, Ms. Lammers requested that the circuit court hold a hearing.  A hearing was held on May 8, 2019.  At the hearing, counsel for the parties discussed on the record the circuit court's rulings on several issues after there had apparently been an in-chambers discussion.  A written order was filed on May 16, 2019.   The circuit court ordered Ms. Lammers to file an amended report within ninety days, Vicky to pay the past-due balance to Ms. Lammers, and both parties to pay Ms. Lammers an additional $2,500 each as a retainer for her services.

Ms. Lammers filed her amended report on January 10, 2020, in which she detailed the revenue and cash flows of NV International, Winston Cup, and Bass Management.  She also attached as exhibits multiple documents she used to make her calculations.  On February 14, 2020, Vicky filed an objection to Ms. Lammers's proposed request for fees for her

31

services.  Vicky further filed her objections to the amended report on March 6, 2020.  To her objection, she attached an unsworn written statement signed by James Recouper and stated that she was incorporating by reference the comments made in the attached statement as her objections.  She further stated that the "author of the objections will be available to testify."  Mr. Recouper criticized the findings in Ms. Lammers's amended report and provided a series of instances in which he alleged Ms. Lammers erred in her calculations and misunderstood the facts.  He alleged that the amended report failed to comply with the circuit court's order and argued that the circuit court should not rely on the report.  In summary, he concluded that "the Amended receivers report must be stricken from the record, given no weight and the Plaintiff wife paid back for paying for all of the expense on the marital or jointly owned by Mr. Bass and Mrs. Bass owned house in Collierville which is $265,000."  He also recommended that the funds "should be placed in the register of the court and dispersed when the divorce is final."

In response, Ned filed a motion to strike Vicky's objections on March 11, 2020.  Ned argued that Vicky's objections should be struck as untimely and pursuant to Rule 12(f) of the Arkansas Rules of Civil Procedure.  Ned further alleged that the written statement prepared by James Recouper was hearsay and should be struck from the record.  Vicky filed her response to the motion to strike on March 26, 2020, and disagreed.  She alleged that she should be afforded an opportunity to question Ms. Lammers about the amended report under oath and to offer testimony and evidence that might contradict the amended report.

A final hearing was held on August 18, 2020, during which Ms. Lammers testified. Ms. Lammers acknowledged that she was ordered to submit an amended report to include a summary of revenues for NV International, Winston Cup, and Bass Management. She also looked for any instances of expenses that were paid by those entities. Although she explained that she looked at the relevant tax returns, general ledgers, and working trial balances prepared by the entities' certified public accountants, she admitted that she did not examine any supporting documentation used by those accountants to prepare the documents she reviewed. Her amended report reflected that NV International and Winston Cup both had net losses from 2008 through 2014 and that no shareholder distributions were made during that time. Bass Management had a net profit of $10,999,034, and $8,019,017 was distributed to the shareholders. Ms. Lammers explained that the income was from the proceeds of the sale of the marina that was later distributed to the parties.

When asked on cross-examination whether she looked to see whether a utility bill was paid by NV International for personal property instead of a business expense, Ms. Lammers admitted that she did not look at twenty-one years of utility bills. Instead, Ms. Lammers explained that if the tax return reflected a "utility expense," she assumed that the entity's accountant had coded the expense properly. Ms. Lammers also answered several questions regarding the various liabilities, loans, and notes of the entities. Ms. Lammers acknowledged that she could not answer whether each note owed was "legitimate" as Vicky's counsel asked. Instead, Ms. Lammers explained that she could only state that it was "on the books" and that she examined the tax returns and ledgers.

After further inquiry by the circuit court, Ms. Lammers testified that from her "efforts" and "audits," she did not think there was "any cash left that needed to be liquidated out" or any further "positive number that's owed by anyone to anyone." Therefore, after much oral argument and discussion, the circuit court concluded that the calculations made in Ms. Lammers's original report as to the marital expenses did not change.

That said, the parties' counsel stipulated that instead of calling Vicky's witness, Mr. Recouper, to testify regarding his objections to Ms. Lammers's amended report, the exhibit with his comments that Vicky attached to her previously filed exhibits would be "what he would testify" at the hearing. Additionally, counsel for both parties discussed several other pending matters, and it was agreed that after the discussion and the circuit court's oral rulings, Ned's counsel would prepare a draft final order for the circuit court.

After Vicky filed objections to the proposed order drafted by Ned's counsel, the circuit court filed an order on September 2, 2020, in which it made the following pertinent findings:

2. . . . The Special Master presented her Amended Report on January 10, 2020, detailing her review of the revenue and cash flows of NV International, Inc., Bass Management, Inc., and Winston Cup, Inc. Based on the Amended Report of the Special Master, dated January 10, 2020, and further based on the testimony of the Special Master and considering the objections of the Plaintiff, the Court accepts the Amended Report of the Special Master and finds that the revenue streams and cash flows of NV International, Inc., Winston, Cup, Inc., and Bass Management, Inc., do not effect the May 20, 2015 Report of the Special Master which was accepted and approved by the Court January 27, 2011, and which is hereby finally accepted and approved without modification.

3. Calculating pursuant to Paragraphs 7 and 19 of the Court's Decree of Divorce, dated January 24, 2014, the Special Master determined that the Defendant is

entitled to receive reimbursement of Eight Hundred Fifty Thousand Four Hundred Sixty Four Dollars Fifty Two Cents, ($850,464.52) from the Plaintiff for the period of time from December 26, 2007 through August 31, 2014.

4. By this Court's Order of January 27, 2017, the Court ordered the Plaintiff to begin paying to the Defendant the sum of Seven Thousand Seventy-Three Dollars Twenty-One Cents ($7,073.21) per month until the marital property was sold, and monthly debt service was no longer required. The Court further ordered the Plaintiff to post a bond in the sum of Seventy-Five Thousand Dollars ($75,000.00) in order to secure the payment of such debt. For the period of time from February 1, 2017 through August 1,2020, the Plaintiff owes the Defendant under the terms of the Court's January 27, 2017 Order, the sum of Three Hundred Four Thousand One Hundred Forty-Eight Dollars Three Cents ($304,148.03).

5. The Special Master is ordered to calculate the Plaintiff's obligation for the period of time beginning September l, 20l4 through this Court's Order of January 27, 2017, pursuant to the method and formula utilized in her original Report filed herein. This calculation shall be completed within twenty (20) days of entry of this Order. The totals for the three (3) time periods shall be added together and the total of the three sums shall be paid by the Plaintiff to the Defendant from the Plaintiff's share of the auction sale of the parties' marital property, based on the Decree of Divorce. Upon receipt by the Court of the Special Master's final calculation, the Court shall immediately notify the parties either that it has been accepted and approved, or the Court shall schedule a hearing on the Special Master's final calculation, to be held prior to the sale date, October 7, 2020.

6. The Court hereby orders the sale of the parties' remaining marital property consistent with the Decree of Divorce on or before October 7, 2020. The proceeds shall be held by the Clerk in the Court's registry pending a specific order of distribution by this Court. The Special Master's Original Report and Amended Report dated January 10, 2020, are hereby specifically approved and accepted.

7. The Motion of the Defendant to strike the objections of the Plaintiff was withdrawn by agreement of the parties.

. . . .

9. The Special Master, Marla Lammers, is owed the sum of Eleven Thousand Six Hundred Eighty-Nine Dollars Seventy-Five Cents ($11,689.75), as of January 14, 2020. This sum is to be paid equally by the parties within ten (10) days of the date of this Order.

A notice of commissioner's sale was filed on September 23, 2020, and the circuit court filed an order confirming the receiver's final report as presented on September 24, 2020. The circuit court further ordered the previously ordered sale to take place on October 7, 2020. In an amended order filed on October 16, 2020, the circuit court granted Ms. Lammers $13,789.75 in fees and ordered each party to pay one-half of the fees within ten days. After the sale of the marital properties, Ned filed a motion to confirm the sale at public auction on October 20, 2020, which the circuit court granted on October 28, 2020. The circuit court found that the real property was sold by the appointed commissioner for $412,000. The circuit court further made the following relevant findings:

2. The Circuit Clerk of Garland County, Arkansas, acting as Court appointed Commissioner did further sell all of the stock of the corporation, Winston Cup, Inc., for the sum of Three Hundred Ten Thousand Dollars ($310,000.00); and, the said Commissioner did sell certain cattle, for the sum of Eight Thousand Dollars ($8,000.00), a Massey Ferguson Tractor for the sum of Ten Thousand Dollars ($10,000.00) and a John Deere Tractor for the sum of Five Thousand Dollars ($5,000.00).

3. The purchaser at the auction, for the real estate and all personal property was the Defendant, Benton Ned Bass. According to the Decree of Divorce entered herein, no bond was required of the Defendant.

4. The Defendant, Benton Ned Bass, does not owe any amount in payment because the Plaintiff is indebted to the Defendant in the sum of One Million Three Hundred Fifty One Thousand Six Hundred Seventy Five Dollars Sixty Four Cents ($1,351,675.64) pursuant to the approved Receiver's report and Order of this Court entered September 24, 2020. The Decree of Divorce and this Court's Order of September 2, 2020, provide that this sum is to be paid to the Defendant from the Plaintiff's share of any sale proceeds.

5. The Court authorizes the Commissioner to issue a Commissioner's Deed for the real property and a Commissioner's Bill of Sale for the personal property, to Benton Ned Bass.

IT IS THEREFORE ORDERED that the Sale at Public Auction be approved and confirmed, and that the Commissioner issue a Commissioner's Deed for the real property and a Commissioner's Bills of Sale for the personal property to Benton Ned Bass. It is further ordered that the Commissioner's fee and expenses shall be paid equally by the parties within ten (10) days of this Order.

This appeal followed.

## IV. *Standard of Review*

On appeal, this court reviews divorce cases de novo on the record. *Taylor v. Taylor*, 369 Ark. 31, 250 S.W.3d 232 (2007). Moreover, we will not reverse a circuit court's finding of fact in a divorce case unless it is clearly erroneous. *Id.* A finding is clearly erroneous when the reviewing court, on the entire evidence, is left with a definite and firm conviction that a mistake has been made. *Chekuri v. Nekkalapudi*, 2020 Ark. 74, 593 S.W.3d 467. We also give due deference to the circuit court's determination of the credibility of the witnesses and the weight to be given to their testimony. *Id.*

## V. *The Validity of the Postnuptial Agreement*

In her first point on appeal, Vicky seeks reversal of the circuit court's finding in the divorce decree that the postnuptial agreement was valid and enforceable. Vicky argues that even though "one of her attorneys attempted to withdraw" her challenge, she had challenged the validity of the postnuptial agreement both before the final hearing and in her motions after the final hearing. Vicky further claims that she was "stopped from challenging" the postnuptial agreement at the final hearing "based upon an alleged finding by the prior judge"

37

that the postnuptial agreement was valid. She explains that the sitting judge's determination was in error and that the record does not reflect any prior order finding that the postnuptial agreement valid. Finally, Vicky argues that the postnuptial agreement was invalid for the following three reasons: (1) there was no mutual agreement to stay married as contemplated in the postnuptial agreement; (2) there was a lack of consideration; and (3) Ned had failed to fully disclose all financial information. In summary, Vicky complains that she was "denied the opportunity to challenge" the validity of the postnuptial agreement and that she would have shown that the postnuptial agreement was invalid. We disagree.

It is undisputed that the parties in this case entered into a postnuptial agreement that can be held to be valid and binding. A postnuptial agreement is an agreement entered into during marriage to define each spouse's property rights in the event of death or divorce and is analyzed under contract law. *Stewart v. Combs*, 368 Ark. 121, 243 S.W.3d 294 (2006); *Simmons v. Simmons*, 98 Ark. App. 12, 249 S.W.3d 843 (2007). In fact, Vicky and her attorneys drafted the postnuptial agreement.

In this case, Vicky changed her legal position as to whether the postnuptial agreement was enforceable or unenforceable in various pleadings and at various hearings as set forth above. However, at trial, Vicky introduced the postnuptial agreement without limitation or reservation as her own exhibit despite her earlier protestation in her second amended complaint. Each party testified extensively regarding the terms of the postnuptial agreement and introduced evidence regarding the value and ownership of certain properties specifically addressed in the postnuptial agreement. Regardless of whether a previous judge may have

38

stated in a previous hearing that the parties had agreed to "abide" by the postnuptial agreement, it is clear from the record that each party had the opportunity to present evidence and to be heard on the issue of whether the postnuptial agreement was valid and enforceable. An appellant cannot complain on appeal that the circuit court erred if the appellant induced, consented to, or acquiesced in the court's position. *Colquitt v. Colquitt*, 2013 Ark. App. 733, 431 S.W.3d 316. From the evidence introduced and arguments presented, the circuit court specifically held that the postnuptial agreement was valid and enforceable. Paragraph 4 of the decree of divorce states the following:

> The parties executed a document titled "Post Nuptial or After Marriage Agreement" ("the agreement") in December of 2007. The parties were each represented by counsel who also signed and approved the agreement and the agreement was witnessed and acknowledged. The agreement was admitted into evidence as Plaintiff's Exhibit No. 1. At Trial, neither party contested the validity of the agreement. Both parties seek to enforce the agreement according to their post-trial briefs, and the Court finds and Orders that the agreement is valid and enforceable with respect to the property and other matters set out in the agreement.

Further, while Vicky argued on appeal that the postnuptial agreement was invalid for the following three reasons: (1) there was no mutual agreement to stay married as contemplated in the postnuptial agreement; (2) there was a lack of consideration; and (3) Ned had failed to fully disclose all financial information, Vicky did not raise these specific issues until her posttrial brief. Because Vicky's arguments are untimely, we summarily dispose of these arguments. *See, e.g., Switzer v. Shelter Mut. Ins. Co.*, 362 Ark. 419, 208 S.W.3d 792 (2005); *Tate-Smith v. Cupples*, 355 Ark. 230, 134 S.W.3d 535 (2003); *Lee v. Daniel*, 350 Ark. 466, 91 S.W.3d 464 (2002).

Therefore, contrary to Vicky's arguments, Vicky was not prohibited from challenging the validity of the postnuptial agreement as she argues, and there is no indication that the circuit court clearly erred in its finding that the postnuptial agreement was "valid and enforceable with respect to the property and other matters set out in the agreement." As such, we affirm on this point.

## VI. *Property Division*

Next, Vicky argues that, assuming the postnuptial agreement is valid, the circuit court failed to follow the agreement. She specifically takes issue with numerous distributions and findings made in the divorce decree. Generally, she argues that the circuit court failed to equally divide the marital property as "intended by the postnuptial agreement and the law." We disagree and address each of her arguments individually.

### A. Marital Residence, Adjacent Acreage, and NV International

Vicky's first argument is that the court erred in finding that the marital residence and adjacent tracts of land were not addressed in the postnuptial agreement. Vicky is correct in her assertion; however, despite the factual misstatement by the court, we conclude that such misstatement did not lead to clear error as explained below.

The court made the following misstatement in paragraph 5 of the divorce decree: "There is certain marital property of the parties which is *not* addressed in the agreement of the parties and which is subject to division by the Court, as follows: . . ." (Emphasis added.) The court thereafter listed the following property: (a) the marital residence located at 368 North Pearcy Road in Garland County, Arkansas, and adjacent 37.82 acres jointly owned

40

by the parties; (b) 19.86 acres adjacent to the marital property and jointly owned by the parties; and (c) 115.09 acres adjacent to the marital residence owned by NV International. That statement is partially incorrect. The marital residence and the adjacent 37.82 acres and 19.86 acres were addressed in the postnuptial agreement. However, the 115.09 acres adjacent to the marital residence owned by NV International arguably was not specifically addressed in the postnuptial agreement.[14]

### 1. *The marital residence and jointly owned adjacent land*

The parties jointly owned the marital residence located at 368 North Pearcy Road, Hot Springs, Arkansas. There were three tracts of land adjacent to the residence. The parties jointly owned the adjacent 37.82-acre tract and the adjacent 19.86-acre tract. A company jointly owned by the parties, NV International, owned the 115.09-acre tract. Paragraph 8 of the postnuptial agreement provides that "HUSBAND and WIFE shall equally divide all *net proceeds* from the sale of the *marital residence and land* located at 368 North Pearcy Road. . . ." (Emphasis added.) It is unclear from the agreement whether the phrase "the sale of the marital residence and land" includes the 37.82-acre tract and the 19.86-acre tract jointly owned by the parties *and* the 115.09-acre tract owned by NV International. Further, the agreement does not define "net proceeds" nor the manner in which to calculate the "net proceeds."

---

[14]This can be construed as a factual error in the decree; however, it was harmless error and is not grounds for reversing the circuit court's disposition of the marital residence and adjacent property. *See Keathley v. Yates*, 232 Ark. 473, 338 S.W.2d 335 (1960).

41

On the other hand, the circuit court clearly determined the sale to include the marital residence and all three tracts of land adjacent to the marital residence in its order for division, as follows:

> 5.     There is certain marital property of the parties which is not addressed in the agreement of the parties and which is subject to division by the Court, as follows:
>
> (a)     The marital residence [and the adjacent 37.82-acre tract,] . . .
>
> (b)     [The adjacent 19.86-acre tract, and] . . .
>
> (c)     [The 115.09-acre tract titled in NV International.]
>
> 6.     The parties shall be allowed a period of six (6) months from the date of this decree to sell the above described real property privately.  However, in the event that the property remains unsold after six (6) months, it shall be sold at auction to the highest bidder. . . .
>
> 7. The property identified in Paragraphs 5(a) through 5(c) shall be sold.  From the proceeds of the sale, the expenses of sale and mortgage indebtedness shall be paid and the balance of the proceeds paid into the Registry of the Court.  From such proceeds, [Ned] shall be compensated for one half (1/2) of the debt service paid by him during the pendency of this divorce and up to the date of the distribution of final sale proceeds, and shall also be compensated for one half (1/2) of the insurance, taxes and maintenance paid during such time.  The court hereby appoints Marla Lammers as receiver for the purpose of receiving information and documentation of [Ned] in order to verify debt service, insurance, taxes and maintenance paid by [Ned]. . . . The remaining balance shall be divided equally between [Vicky] and [Ned].

While a court has no authority to modify a couple's independent contract, the contract is still subject to judicial interpretation.  *Klenakis v. Klenakis*, 2017 Ark. App. 36, 510 S.W.3d 821.  When reviewing the circuit court's interpretation of the agreement, the first rule is to give to the language employed the meaning that the parties intended.  *Rowan v. Rowan*, 2022 Ark. App. 143, 643 S.W.3d 62.  In construing any contract, we must consider

the sense and meaning of the words used by the parties as they are taken and understood in their plain and ordinary meaning. *Id.* Ambiguities in a written contract are construed strictly against the drafter. *Yepez v. Yepez*, 2022 Ark. App. 31; *Emis v. Emis*, 2017 Ark. App. 372, 524 S.W.3d 444. Here, Vicky's attorney drafted the postnuptial agreement; therefore, any ambiguity in the agreement is to be strictly construed against Vicky. Finally, circuit courts are charged with achieving equity in divorce cases. *See Jones v. Jones*, 2014 Ark. 96, 432 S.W.3d 36.

The heart of Vicky's argument is that the circuit court erred in allowing Ned to be compensated for his one-half of expenses incurred in maintaining the marital residence and land during the pendency of the divorce. Vicky argues that such compensation "is nothing more than temporary alimony." In essence, the postnuptial agreement provided that the marital residence and land should be sold with the *net proceeds* divided equally between the parties. That is contrasted with the decree of divorce that provided that the marital residence and land should be sold and the *remaining balance* divided equally between the parties. The only significant difference between the postnuptial-agreement distribution and the decree-of-divorce distribution is that in the decree of divorce, the court allowed Ned to be compensated from the sales proceeds in the amount of one-half of any costs he expended in maintaining the residence and land during the multiyear pendency of the divorce. Further, to remain objective, the circuit court appointed a receiver to review the documentation of the amounts paid by Ned and present a report to the court. That is precisely what occurred. The court appointed Marla Lammers as the receiver. She requested that each party provide

her with any evidence of funds expended during the pendency of the divorce to maintain this property so that she could determine each party's contributions and compensation, if any. Ned submitted evidence of certain expenses he funded. Vicky did not. Ms. Lammers testified that she had sent a letter to both Vicky and Vicky's attorney requesting information about any debts Vicky may have paid for purposes of one-half compensation. Ms. Lammers testified that she did not receive a response to her letter. Ms. Lammers then stated she followed up the letter with a phone call but that she never received any records from Vicky or her attorney. Accordingly, from the evidence submitted, the receiver generated a report that was ultimately relied on by the court. As such, the circuit court's ultimate division of the marital residence and the 37.82-acre tract, the 19.86-acre tract, and the 115.09-acre tract was not clearly erroneous.[15]

## 2. *NV International*

Vicky next argues that the court erred in its division of NV International. This is essentially the same argument set forth in the preceding section. NV International was jointly owned by Vicky and Ned, and it owned the 115.09-acre tract adjacent to the marital residence. The postnuptial agreement did provide, "Likewise, upon the sale of NV INTERNATIONAL INVESTMENTS, all funds or money or consideration given for said sale shall be divided equally between HUSBAND and WIFE[.] . . ." Again, the agreement

---

[15]Vicky also contends that the postnuptial agreement implies that any sale of the property was to be accomplished only by private sale. We disagree. A reading of the postnuptial agreement shows that it does not provide for, or imply, any required method of sale.

did not define the assets of NV International, nor did it define the manner in which the sale of any assets should occur. Accordingly, the circuit court distributed the sales proceeds from this adjacent tract in the same manner as it distributed the sales proceeds from the marital residence and the adjacent 37.82- and 19.86-acre tracts, and we cannot find that the court clearly erred in its division of NV International.

## B. Debt Service

Vicky next seeks reversal on the basis of the circuit court's decision to order the proceeds from the sale of real property to first be placed in the registry of the court to allow Ned to deduct the amount he expended toward debt service on their property during the pendency of the divorce with the remaining proceeds to be divided equally between the parties. She emphasizes that the postnuptial agreement merely provides that the proceeds of the sales would be equally divided between the parties. Again, this is yet another slant on the court's decision to allow Ned compensation for funds he expended during this multiyear litigation in maintaining the marital property, which we have previously analyzed and affirmed.

In this case, the postnuptial agreement did not specifically address how the debt service of the property would be handled. It is highly unusual for divorces to remain pending for as many years as this case has, and under the circumstances here, we affirm the circuit court's interpretation of the postnuptial agreement. The net proceeds of any sale are necessarily affected by the amount of debt the parties reduced during the pendency of the divorce. Thus, it was not an error to give Ned credit for this debt service.

45

## C. Attorney's Fees and Costs

Vicky also argues that the circuit court erred when it ordered both parties to pay their own costs and fees in the divorce decree. Vicky argues that the postnuptial agreement clearly provided that Bass Management (a company jointly owned by the parties) would pay all attorney's fees in the event of divorce "unless each agree that such fees are excessive." Again, we find no clear error under the circumstances. Bass Management originally owned Brady Mountain Resort and Brady Mountain One Stop. However, those properties had been sold and the proceeds distributed to the parties before trial. At trial, Ned testified that Bass Management did not have any money and that Bass Management no longer had a bank account. Moreover, the court-appointed receiver, Ms. Lammers, later testified that from her "efforts" and "audits," she did not think Bass Management had "any cash left that needed to be liquidated out." In the decree, the circuit court found that "[n]othing more remains to be done with respect to . . . Bass Management, Inc." Therefore, under the circumstances, Bass Management no longer had any funds from which the circuit court could order it to pay Vicky's attorney's fees. As such, we cannot find clear error and affirm.

## D. Collierville Residence (Not the Marital Residence)

Another point of contention raised by Vicky is that the circuit court ordered that her Collierville, Tennessee, residence be sold in violation of the postnuptial agreement. We agree that the postnuptial agreement provided that the Collierville residence would be her "sole and separate property." However, the postnuptial agreement did not require Ned to pay the mortgage or any other expenses for the Collierville residence, which was to be

46

"purchased by WIFE."[16]  The court's order requiring the sale and Vicky's failure to profit from the sale of the Collierville residence did not contravene the postnuptial agreement. Instead, the circuit court had previously ordered Vicky to make the note and mortgage payments on the Collierville residence.  However, Vicky failed to make the payments as ordered.  In its September 10, 2013, order, the circuit court found Vicky in contempt for failing to pay the note and mortgage on her residence in Collierville in the amount of $51,000, which Ned had paid.  It also found that she was in contempt of court for accessing a line of credit through the parties' joint bank account in the amount of $4,000.  The court allowed her the opportunity to purge herself of contempt by paying Ned $55,000.  Vicky failed to pay the money as ordered, and the circuit court ordered the Collierville residence sold as a result of her inaction.  The circuit court filed a revised order appointing a receiver to sell the property on December 20, 2013, and an order confirming the sale of the Collierville residence on January 30, 2014.  Unfortunately, the sale did not result in any additional funds that the circuit court could have then awarded Vicky, and Ned, in fact, had to pay the outstanding debt after the funds from the sale were applied.  Under these circumstances, we find no clear error and affirm.

---

[16]The postnuptial agreement actually provided that Ned would pay $15,000 a month and "be solely responsible for the Tennessee residence note . . . until the closing and actual receipt of the funds from the sale of Brady Mountain Resort . . . ."  The distribution of the sales proceeds from Brady Mountain Resort occurred on April 8, 2008, when the circuit court filed an order equally distributing to Ned and Vicky $2,734,270.36 each from the sales proceeds.  As such, Ned had no responsibility to make the mortgage payments after April 8, 2008, per the postnuptial agreement.

E. Brady Mountain One Stop

Vicky also seeks reversal of the circuit court's findings in the divorce decree that "[n]othing more remains to be done with respect to Brady Mountain One Stop[.]" Vicky contends that Ned ultimately was allowed to repurchase Brady Mountain One Stop for less than fair market value using assets from NV International. She alleges that there was no confirmation of sale to Ned and that the records did not reveal a mortgage on Brady Mountain One Stop that needed to be satisfied upon the sale in the first place. She basically argues that Ned manipulated the evidence to receive Brady Mountain One Stop as his sole property without benefit to her. She therefore argues that Brady Mountain One Stop is still marital property that should be disposed of by the circuit court. Vicky misstates the facts, and we decline to reverse on this basis.

Recall that Brady Mountain One Stop was not producing sufficient income to pay its expenses, and Ned petitioned the court to sell the property. In the decree, the circuit court found that Brady Mountain One Stop had been sold and that the court had confirmed its sale. The record reflects that the circuit court ordered Brady Mountain One Stop to be sold at public auction to the highest bidder. At auction, the bidding did not reach the stated reserve, which was the approximate amount of the mortgage debt owed First National Bank. However, Ned individually was the highest successful bidder and offered to purchase the property subject to the current mortgage in anticipation of paying it off or refinancing. Therefore, the circuit court filed an order confirming the public sale on August 19, 2013, and Ned took the property subject to the mortgage free and clear of Bass Management's

interest. At trial, Ned introduced a copy of the original mortgage with First National Bank that he had signed on behalf of Bass Management in 2004. Before he subsequently sold the property to a third party, Ned admitted at trial that he had to substitute collateral because he did not have the funds to satisfy the mortgage at that time. He testified that because he did not want to encumber anything Vicky would have an interest in under the postnuptial agreement, he mortgaged the 62 acres that the children were to receive under the postnuptial agreement and told both children before he did so. He testified that he also told his children that he would pay it off as soon as he could afford to do so. Importantly, the divorce decree states that the 62 acres he mortgaged "shall remain subject to the [postnuptial] agreement" in paragraph 8. In light of this evidence, Vicky's arguments on appeal lack merit, and we cannot conclude that the circuit court's finding that "[n]othing more remains to be done with respect to Brady Mountain One Stop" was clearly erroneous. As such, we affirm.

## F. Log Cabin Liquor

Vicky next challenges the disposition of Log Cabin Liquor. Vicky sold her interest in the business for $125,000 *before* she signed the postnuptial agreement. However, she argued at trial that Ned's interest in the corporation was not fully disclosed to her, and she seeks reversal of the finding that she was aware of Ned's interest in the corporation. Again, the circuit court heard extensive evidence on this point. Contrary to her assertions, the circuit court found that her contention that Ned's interest in "Log Cabin Liquor, Inc. was 'undisclosed or hidden' is clearly wrong." It further found that Vicky "was fully aware of Log Cabin Liquor, Inc. at the time of the agreement; she sold her interest in the business months

49

before signing the agreement and received One Hundred Twenty-Five Thousand Dollars ($125,000.00) as shown by the undisputed evidence." On the record before us, the court's findings are not clearly erroneous.

## G. Unfair Division of Property

Finally, under this point, Vicky argues that the division of property was unfair and ignored the spirit of the parties' agreement. In support, she emphasizes that there were documents to indicate that Ned had a net worth of $15,722,900 and that Vicky received a distribution of only $4,925,681 in the divorce. However, her argument lacks merit. The document on which Vicky relies indicating Ned's net worth was unsworn, dated in 2007, and first introduced in the disposition of Vicky's motion for new trial. Moreover, Ned responded that the 2007 document did not consider the difference between fair market value and liquidation value of the assets and that the document also included assets that had been subsequently sold. Again, on this record, we find no reversible error and affirm the circuit court's findings.

## VII. *Expenses*

As discussed above, the divorce decree required Vicky to pay Ned one-half of the expenses he incurred "keeping things afloat" during the pendency of the litigation. Ms. Lammers was appointed to determine the amount Vicky owed Ned. Ms. Lammers issued her report and amended reports, Vicky objected to them, and after extensive testimony, the circuit court reached a final figure that Vicky was required to pay Ned.

In her final point on appeal, Vicky challenges, in general, the sum reached by Ms. Lammers and adopted by the circuit court. Her arguments for reversal can be classified as complaints that the court's findings were clearly erroneous because they were based on Ms. Lammers's reports, which were unreliable and biased. She emphasized that Ms. Lammers's report was based primarily on information from Ned and that it was unclear whether Ned actually paid certain expenses himself—instead, it appeared as though certain corporate entities paid some expenses. She also argued that Ned must have removed cash and other assets. She alleges that Ned had been removing cash from Brady Mountain Resort, and she also points to her testimony that she thought more cattle should have been on the marital property than Ned testified remained. Vicky criticizes Ms. Lammers's methodology and calculations and alleges that Ms. Lammers "jumped to a conclusion that favored" Ned without complete information. As support for her arguments, she calls attention to the testimony of her own expert, Mr. Goldstein, and requests that we reverse and remand. We decline to do so.

Ms. Lammers submitted her initial report on or about May 20, 2015. Subsequent to that initial report, the court held at least four hearings at Vicky's request: July 1, 2016; December 13, 2016; May 8, 2019; and August 18, 2020. Ms. Lammers either testified or was available for testimony in each of the hearings and was subject to cross-examination by Vicky's then attorney. Further, in addition to disagreeing with some of Ms. Lammers's conclusions, Vicky retained her own expert witness, Mr. Goldstein, who presented testimony that was contradictory to Ms. Lammers's testimony. At the conclusion of the four posttrial

hearings, after having the benefit of hearing testimony from Ms. Lammers and Mr. Goldstein and being able to review the voluminous number of financial records that were admitted and discussed at the multiple hearings, the circuit court ultimately agreed with Ms. Lammers's reports and credited her testimony.

Our appellate courts have reiterated that we give due deference to the circuit court's superior position to determine the credibility of witnesses and the weight to be given their testimony. *See Brave v. Brave*, 2014 Ark. 175, 433 S.W.3d 227; *Wilcox v. Wilcox*, 2022 Ark. App. 18, 640 S.W.3d 408; *Atherton v. Atherton*, 2018 Ark. App. 245, 547 S.W.3d 759. As such, the circuit court was free to credit and give greater weight to Ms. Lammers's testimony over Mr. Goldstein's testimony. On this record, we cannot hold that the circuit court clearly erred and committed reversible error. Thus, we affirm the circuit court's findings.

In conclusion, after reviewing each argument that appellant makes on appeal, we are not left with a definite and firm conviction that a mistake has been made, and we affirm the circuit court's orders.

Affirmed.

GLADWIN and BARRETT, JJ., agree.

*Richard E. Worsham*, for appellant.

*Legacy Law Group*, by: *Bryan J. Reis*, *Michelle Strause*, and *Philip B. Montgomery*, for appellee.